NATIONAL LABOR RELATIONS BOARD
v. KEN ROSE MOTORS, Inc.

No. 4605.

United States Court of Appeals
First Circuit.

Jan. 21, 1952.

Fannie M. Boyls, Attorney, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Abraham Siegel, Attorney, all of Washington, D. C., on brief), for petitioner.

Edmund J. Blake, Boston, Mass., for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board, pursuant to the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., hereinafter called the Act, has petitioned this court for enforcement of its order of May 28, 1951, under § 10 of the Act, 29 U.S.C.A. § 160, against the respondent, Ken Rose Motors, Inc.

Ken Rose Motors, Inc., is a Massachusetts corporation with its office and place of business at Wakefield, Massachusetts. It is engaged in the sale and service of Ford pleasure cars, trucks, and automotive parts under a franchise from Ford Motor Company, of Dearborn, Michigan. All new cars, trucks, and 90 percent of the parts sold by Ken Rose are purchased from the Somerville, Massachusetts, plant of the Ford Motor Company. Annual purchases of Ken Rose amount to approximately $100,000 of which 70 percent is expended for cars and trucks. Annual sales total about $130,000 of which 50 percent represents sales of used cars and parts. Ken Rose also sells oils and gasolines, with annual sales and purchases, $6,000 and $4,000, respectively. All purchases and sales of Ken Rose are made within the Commonwealth of Massachusetts.

The charges here were filed on August 25, 1950, by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Local 841 thereof, affiliated with the American Federation of Labor, and International Association of Machinists, unaffiliated, and Lodge 1898 of District 38 thereof, unaffiliated, hereinafter referred to as the union.

The respondent admits that all employees of respondent employed at its Wakefield plant, engaged in the repairing, servicing

and maintaining of automotive equipment, including mechanics, bodymen, painters, helpers, on the job trainees, partsmen, greasers, and washers, but excluding office and clerical employees, guards, professional employees, and all supervisors as defined in Section 2(11) of the Act, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act.

The respondent also admits that on or about June 3, 1950, and at all times thereafter, it did refuse and continues to refuse to bargain collectively with the union as the exclusive representative of all the employees in said unit.

However, the respondent denies in substance that it is engaged in interstate commerce; that the union has ever been the representative for the purpose of collective bargaining of a majority of employees in the unit and further denies that the union is presently representative of any of its employees. The respondent admits that on or about June 2, 1950, the union requested respondent to bargain collectively and said request was denied resulting in a union petition for certification on June 9, 1950. The respondent states that an election was scheduled for August 25, 1950, but was cancelled by the Board on August 24, 1950 because of the union's withdrawal of its petition for certification. The respondent thus concludes that the union has never at any time been certified by the Board as the bargaining agent for any of its employees. The respondent further denies that it has interrogated and warned its employees about union activities; that it has offered economic benefits and threatened its employees with discharge and other reprisals for the purpose of discouraging union membership; that by its acts it engaged in unfair labor practices within the meaning of § 8(a)(5) and § 8(a)(1) of the Act; that its activities tend to lead to labor disputes burdening and obstructing interstate commerce, and that its acts constitute unfair labor practices within the meaning of § 8(a)(1) and (5) and § 2(6) and (7) of the Act.

The facts are more fully set forth in 94 N.L.R.B. No. 141 and need only be briefly stated here. The respondent sells Ford vehicles and parts under a franchise in the form of a contract with the Ford Motor Company, entitled "Ford Sales Agreement." The contract made in Michigan, among other things, obligates the Ford Motor Company to sell and the dealer, Ken Rose Motors, Inc., to purchase Ford products for resale upon the terms and conditions set forth in the agreement. These terms and conditions are intended to protect the good name and good will and business of the Ford Motor Company, to assure Ford that its products will be made available to the public and that service facilities will be made available to the ultimate users of its products and to assure or inform Ford of the financial stability of the dealer. The contract governs the relationship between the dealer and Ford and between the dealer and other dealers and likewise sets forth certain standards for the dealer in his relations with the public concerning resale policies, display of price charts, type of service to owners of Ford products and certain trade and advertising practices.

Union activity commenced among the respondent's employees in April 1950 after the employees had been notified by Hustler, the respondent's service manager, that they would have to work on April 19, 1950, Patriots' Day, which in previous years had been a paid local holiday. The union was contacted and, as a result, union authorization cards were signed by eight of the respondent's nine employees. Having these cards, the union on June 1, 1950, wrote to the respondent notifying it that the union represented a majority of the employees and requested a meeting for negotiating a contract. The respondent admittedly refused to bargain with the union. Rose, the respondent's president, after the receipt of the union's letter on or about June 2, 1950, made a speech to his employees concerning the union and union activities. It was clearly an anti-union speech which contained a variety of threats. Hustler continued the anti-union campaign by interrogating the workers about their union activities, by seeking out the instigators of the union

activity and by making various statements obviously designed to discourage union membership.

On June 8, 1950, the union filed a representation petition with the Board. A hearing was conducted and the Board on July 28, 1950 ordered an election "as early as possible, but not later than 30 days from the date" of the direction. The election was scheduled for August 25, 1950. However, the union was allowed on August 24, 1950 to withdraw its petition and file unfair labor practice charges against the respondent on August 25, 1950.

After consideration of the entire record, the Board agreed with the trial examiner's conclusion that the respondent refused to bargain with the union and thereby violated § 8(a)(5) and (1) of the Act.

■ We conclude after a review of the testimony and exhibits in this case that the findings of the Board are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

The questions of law presented here are (1) whether or not the Board had jurisdiction and (2) whether or not the Board erred, without an election, in ordering respondent to bargain with the union.

■ We agree with the Board that it had jurisdiction on the facts here. The "Ford Sales Agreement" ties the respondent into a vast national network of an integrated distribution system which affects commerce. The activities of Ford and the respondent are shaped to a pattern which is found throughout the nation.

In National Labor Relations Board v. Conover Motor Co., 10 Cir., 192 F.2d 779, 781, the court said: "The fact that these dealers are only one of many and that the repercussions of a work stoppage in their business would have relatively little impact on the total flow of the manufacturers' interstate activities is not fatal to jurisdiction. 'Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce.' Polish National Alliance v. N.L.R.B., supra (322 U.S. 643, 64 S.Ct. [1196] 1199, 88 L.Ed. 1509); N.L.R.B. v. Denver Building and Construction Trades Council, supra (341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284); United Brotherhood of Carpenters v. Sperry, supra (10 Cir., 170 F.2d 863); N.L.R.B. v. Townsend, 9 Cir., 185 F.2d 378. To deny jurisdiction of the Board would allow thousands of retailers of new automobiles to engage in unfair labor practices with impunity. The 'total incidence' of such unfair labor practices if left unchecked would not only substantially interfere with the free flow of commerce, but would conceivably bring to a complete standstill the interstate transactions of one of the Nation's greatest industries. * * *" See N.L.R.B. v. Davis Motors, Inc., 10 Cir., 192 F.2d 782.

■ The second question was recently passed upon by this court in the case of N.L.R.B. v. Kobritz, d/b/a Star Beef Company, 92 N.L.R.B. No. 170 affirmed 1 Cir., 193 F.2d 8. This case is similar in some respects to the Star Beef Company case. Here the Board found the respondent did not have a bona fide doubt of the union's majority status. As this court said in the Star Beef Company case: "It is true that the union, upon meeting such refusal to bargain, first adopted the course of filing a representation petition for certification by the Board under Section 9 of the Act. Later this representation petition was dismissed at the union's own request. But the right of employees to bargain collectively through an exclusive bargaining representative is not conditioned upon an antecedent certification by the Board where, as here, the majority status of the union is clearly established otherwise, and the employer has no bona fide doubt of such majority status, but seeks to delay bargaining negotiations while resorting to various coercive tactics designed to dissipate the union majority support. * * *" (Cases cited.)

A degree will be entered enforcing the order of the Board.