# NATIONAL LABOR RELATIONS BOARD v. BILL DANIELS, Inc. et al.

# NATIONAL LABOR RELATIONS BOARD v. GILBERT MOTOR SALES, Inc.

## Nos. 11536, 11582.

United States Court of Appeals, Sixth Circuit.

Jan. 20, 1953.

Rehearing Denied March 17, 1953.

580

John E. Jay, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers and Frederick U. Reel, Washington, D. C., on the brief), for petitioner.

Frank E. Kenney, Detroit, Mich., for respondents.

Before SIMONS, Chief Judge, and AL-LEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

The question presented in these cases arising out of petitions for enforcement of orders of the National Labor Relations Board is whether a Michigan automobile dealer who operates independently under a sales contract with the Ford Motor Company (hereinafter called Ford) and sells entirely within the state of Michigan, or 99% within that state, parts, accessories and motor cars purchased from Ford within the state of Michigan, is engaged in commerce among the several states within the meaning of the National Labor Relations Act as amended, 29 U.S.C.Supp. IV, § 141 et seq., 29 U.S.C.A. § 141 et seq. It is agreed that Ford is engaged in interstate commerce and that the parts and accessories in question are manufactured outside the state. The motor cars are assembled within the state of Michigan from parts manufactured outside the state.

Respondent Gilbert Motor Sales, Inc. (hereinafter called Gilbert) and respondent Walker Motors, Inc. sell no cars, parts or accessories outside Michigan. All three respondents make their purchases of vehicles, parts and accessories entirely within the state. Respondent Daniels, Inc. shipped 1% of its sales in interstate commerce during the period involved. This is the only material variation in the facts and the two petitions for enforcement involve in general identical propositions of law.

The facts are stipulated and may be summarized as follows:

The respondents are retail dealers in Ford motor vehicles and they also sell parts and perform service operations. Ford operates manufacturing plants in Michigan, Ohio and New York and assembly plants within fourteen states. More than one-half of the parts and accessories sold by Ford to its service dealers come from plants outside Michigan. In 1948 Ford manufactured more than a million vehicles. The cars here involved are assembled by Ford in Michigan at Ford's Dearborn plant and the parts and accessories involved are de-livered to respondents from the Dearborn plant, where they have been held up-on arrival from outside the state. With the exception of a few sales to the United States Government and sales of company used cars, Ford does not sell vehicles at retail, but operates through some seven thousand independent dealers. All parts purchased from Ford outside the state are finished parts sold by independent manufacturers not affiliates of Ford.

Ford and the retail dealers operate under a written agreement which the National Labor Relations Board in its brief denominates "a franchise." However, the contract lacks the indispensable element of franchise for it is not conferred by any sovereignty or state. Bank of Augusta v. Earle, 13 Pet. 519, 585, 10 L.Ed. 274; California v. Central Pacific Rd. Co., 127 U.S. 1, 40, 8 S.Ct. 1073, 32 L.Ed. 150. Even though such contracts are sometimes loosely referred to as franchises, the sales contract is an agreement between two private entities arising out of the "general right to engage in a lawful business, part of the liberty of the citizen". Mr. Justice Brandeis in Frost v. Corporation Commission, 278 U.S. 515, 534, 49 S.Ct. 235, 242, 73 L. Ed. 483. The contract deals with and makes provision for situations which call for adjustment between a wholesale manufacturer and a retail dealer.

The sales agreement expressly provides that the dealer is to operate independently. It reads as follows:

"Dealer Not To Act As Agent

"(7) Dealer further agrees not to make any representation or warranty concerning Company products on behalf of Company, but to refer purchasers to 'Manufacturer's Warranty' printed on back of Retail Buyer's Order form supplied by Company and not in any manner to attempt to assume or create obligations on behalf of Company or in any manner attempt to act as agent of Company."

*   *   *   *   *   *

"Limitation Of Company's Liability

"(12) * * * It is distinctly understood that this agreement contem-

plates that Dealer will acquire Dealer's own plant and facilities in accordance with Dealer's own discretion and will purchase Company products as Dealer's own and resell them to customers selected by Dealer, all in conformity with the requirements and limitations herein specified but otherwise in Dealer's own discretion. Nothing herein contained shall impose any liability on Company for any expenditures made or incurred by Dealer in preparation for performance or in performance of this agreement."

Certain restrictions are agreed to which presumably are mutually beneficial. The right to approve the location of the dealer's business is given to Ford. The dealer agrees not to represent non-genuine Ford parts as genuine and representatives of Ford may investigate complaints that this agreement has been violated. The dealer agrees not to sell at less than the minimum price suggested, but is not forbidden to sell above that price. While Ford representatives regularly call at the dealer's place of business to give advice and counsel upon mutual problems, Ford has no general control over the operation. The service department, for instance, is in no way supervised.

Ford makes a charge to all dealers for each car purchased. This money is invoiced as a part of the purchase money for each car, belongs to Ford, and is used by Ford for promotional advertising. Also, under dealer authorization, Ford lists an additional amount on the invoice of each car. Ford acts as collector of this amount and sends it to the Dealer's Advertising Fund. A committee of dealers administers this money locally for advertising in the Detroit metropolitan area.

Each of the three respondents has been involved in representation proceedings as a result of which the Board ordered elections and certified the union as bargaining representative. Each respondent refused to bargain with the union, contending that it was not engaged in interstate commerce. The present complaint proceedings were then instituted charging respondents with unfair labor practices in refusing to bar-

gain with the union. The Board ruled that the respondents were engaged in interstate commerce, found that they had violated the statute in refusing to bargain collectively, and issued the usual cease and desist orders which are the subject of these enforcement proceedings.

Respondent Gilbert contends that the Board erred in entertaining a second petition for certification of representation within the twelve month period following the election of July 21, 1949, which had been directed by the Board in a previous representation proceeding. It urges that this action of the Board violates "the spirit if not the letter" of the statute, which provides in § 159(c) (3) that "No election shall be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held."

The purpose of this section clearly is to relieve the employer of additional representation proceedings for one year after the Board has directed and held a valid election. That this section would be entirely robbed of its intended force if the Board should allow representation proceedings to be instituted within the second or third month after an election is self-evident; but the wording of the section is plain. It prohibits, not the filing of a representation petition, but the direction of an election within the twelve month period. Here the second election was directed August 4, 1950, the preceding election having been held July 21, 1949. We conclude that this contention has no merit.

Respondent Gilbert attacks the receipt in evidence of the transcript of representation proceedings involving respondent and other Ford dealers in a previous case, 7–RC–143. Section 9(d) of the National Labor Relations Act as amended provides:

"Whenever an order of the Board made pursuant to section 10(c) is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section, and there is a petition for the enforcement or review of such order, such certification and the record of such investigation

shall be included in the transcript of the entire record required to be filed under section 10(e) or 10(f), and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript."

It is clear that this section does not provide for the admission of transcripts of other proceedings in the transcript of record for judicial review. In fact, it prohibits the receipt of the transcript here, for the order of the Board of which enforcement is sought is not based, either in whole or in part, upon facts certified growing out of representation proceeding 7–RC–143. This record does not show what if any facts were certified from that proceeding. Moreover, local 415 instituted No. 7–RC–143, while Local 408 instituted 7–RC–960. The parties involved in the second representation proceedings were different from those involved in the first and the issues were not necessarily identical. It was error to admit the transcript.

■ The contention of Daniels and Walker as to the admission of certain evidence in the unfair labor charge against them has less merit. They contend that the Board erred in allowing the introduction of additional evidence in the complaint proceedings after the issue as to the jurisdiction of the Board had been litigated in the representation proceedings. No prejudice is shown and this contention is overruled.

■ On the merits of the question enforcement must be denied. The respondents clearly are not carrying on interstate commerce. All three dealers involved buy cars, parts and accessories within the state of Michigan. The motor vehicles are assembled and sold to them by Ford within the state of Michigan. Except for the negligible amount of 1% heretofore mentioned, respondents' sales of vehicles are made within the state of Michigan. Each dealer's service department operates locally.

The Board contends (1) that the dealers are engaged in activities affecting commerce because they handle goods produced without the state and (2) that the agreement with Ford transforms the dealers' operations into an interstate transaction, making the dealers part of a national organization carrying on interstate commerce. Its first contention ignores the admitted fact that purchases from Ford by the dealers of vehicles and parts are entirely within the state of Michigan.

The Board urges that the geographical location of these dealers is not significant. But if the operation is entirely intrastate and one which would not substantially affect or injure interstate commerce the Board has no jurisdiction. The circumstance that these dealers made all of their purchases in Michigan and practically all of their sales in Michigan is the controlling fact of the case.

■■ If construed as the Board contends in this case the constitutional term "interstate commerce" will lose its meaning. The boundary between state and nation will be obliterated. As stated by Chief Justice Hughes in N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893:

"The grant of authority to the Board does not purport to extend to the relationship between all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds."

■ The Supreme Court continues, speaking of the scope of congressional power of control over intrastate activities that have a close and substantial relation to interstate commerce, 301 U.S. at page 37, 57 S.Ct. at page 624:

"Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so in-

direct and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."

■ The Board contends also that the dealers involved are "an integral part of the Ford Motor Company which is a multistate enterprise whose operations are admittedly interstate." This contention has no merit. In order to be an integral part of Ford these dealers would have to be either employees or agents of Ford. It is not contended that they are employees and there is no evidence in the record that the dealers are agents of Ford. The contracts in essence are contracts between vendor and purchaser.

■ The sales contract, which expressly declares that the dealer is independent in his operations, does not establish a relationship of principal and agent. Burkhalter v. Ford Motor Co., 29 Ga.App. 592, 116 S.E. 333; McMaster, Inc. v. Chevrolet Motor Co., D.C., 3 F.2d 469. Cf. Ford Motor Co. v. Union Motor Sales Co., 6 Cir., 244 F. 156. The restrictions voluntarily contracted for do not affect the situation. The test of agency is whether the dealer represents Ford and has authority to bind Ford. Under this record there is no evidence to this effect.

■ The efficient mutual arrangements made under the sales contract give it no interstate character. Respondents buy in Michigan, sell in Michigan, and perform a local service. The fact that they cooperate to avail themselves of the privilege of national advertising is so small an element in the operation that it does not affect the conclusion that the work done is local.

These principles are not altered by decisions of the Supreme Court of the United States which not only cover different statutes but involve interstate operations. Thus, in United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, a Sherman Act case, the liquor dealers who conspired to cut the retail price of liquor were carrying on an interstate business. In United States v. Women's Sportswear Mfrs. Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805, the jobbers whose agreement with stitching contractors was held to violate the Sherman Act sold about 80% of their annual production in interstate commerce. United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297, construes the Pure Food and Drugs Act and holds that the operation of misbranding a certain drug falls within the literal prohibition of the Act. Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S. Ct. 511, 512, 90 L.Ed. 607, arose under the Fair Labor Standards Act. The publishing under consideration was interstate to a fraction of 1%. The court pointed out the distinction between the Fair Labor Standards Act and the National Labor Relations Act and held that the *de minimis* doctrine did not apply in wage and hour cases. The Fair Labor Standards Act makes unlawful the shipment in commerce of "any goods in the production of which any employee was employed in violation of" the Act. The National Labor Relations Act, on the contrary, regulates labor disputes "affecting commerce" and the rule in such cases is that the power of Congress extends to the protection of interstate commerce from interference or injury, even though it is due to activities which are wholly intrastate. N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014. In that case the materials processed in New Jersey were regularly transmitted by the owner to the processor in interstate commerce and regularly sent out to interstate destinations.

The controlling question here is whether the clearly local transactions of these particular dealers who make all their purchases within one state and sell the vehicles and parts which they handle within the same state affect, interfere with or injure interstate commerce. It is possible that other Ford dealers may purchase goods from outside the state where they operate and sell them to purchasers in different states. This record reveals a totally different situation. There is no evidence that these transactions substantially affect interstate commerce.

■ We are not entitled to infer that the activities of these three respondents as to the small groups of employees certified here as units of representation would affect the manufacture of motor vehicles by Ford or the sale of parts and accessories from without the state. If there is any connection between these local operations and interstate commerce it is too remote to subject these respondents to the operation of the Act. N. L. R. B. v. Jones & Laughlin Steel Corporation, supra, 301 U.S. at page 37, 57 S.Ct. 615.

Neither do most of the cases cited from Courts of Appeals support the contention of the Board that these petitioners are engaged in activities affecting commerce. N. L. R. B. v. Henry Levaur, Inc., 1 Cir., 115 F.2d 105, was a case in which all of the new cars bought by the dealer were shipped to him from outside the state. A majority of the new cars which he exchanged, and 10% of those which he sold, went to persons out of the state. In Williams Motor Co. v. N. L. R. B., 8 Cir., 128 F.2d 960, under its contract the dealer was compelled to make arrangements for selling and servicing cars throughout an interstate territory covering parts of three states. No question of engaging in interstate commerce was raised in N. L. R. B. v. J. C. Lewis Motor Co., 5 Cir., 180 F.2d 254 and N. L. R. B. v. Wentworth Bus Lines, 1 Cir., 191 F. 2d 849 and these cases have no bearing.

Two decisions from the First Circuit Court support the Board's contention. N. L. R. B. v. Ken Rose Motors, Inc., 1 Cir., 193 F.2d 769 and N. L. R. B. v. Somerville Buick, 1 Cir., 194 F.2d 56. The Somerville case was decided on the authority of the Rose case without further discussion of the question involved here and gives no help. There the court held broadly that the dealer was tied by the Ford sales agreement into a vast national network of an integrated distribution system. In support of this conclusion it cited N. L. R. B. v. Conover Motor Co., 10 Cir., 192 F.2d 779 and N. L. R. B. v. Davis Motors, Inc., 10 Cir., 192 F.2d 782, both of which cases involved dealers who purchased all of their automobiles outside the state in which they did business. These authorities do not support the holding that in purely local transactions such as those presented here, interstate commerce will be affected by a labor dispute. We think that the conclusion of the cited cases based upon the Conover and Davis decisions, supra, is not justified.

No substantial part of the respondents' activities relates to goods moving in the channels of interstate commerce. If a line is to be drawn anywhere in support of the intention of Congress to leave local business to the protection of the states it must be drawn here. The petition for enforcement is denied.

### On Petition for Rehearing.

The National Labor Relations Board has filed a petition for rehearing. It contends that the court erred in holding that the Board in the Gilbert case erroneously admitted in evidence the transcript of Johns Bros., 7–RC–143. The Johns Bros. cases involved 22 separate Ford dealers, while the instant cases involve three. The record shows that Local 415 was the local proposed by the Union to represent the employees in cases Nos. 7–RC–143, etc., whereas the charge was filed in the instant case by Local 408. The International Union U. A. W. (CIO) was a party in each case. We held that with such a diversity of parties it was error to introduce the transcript in evidence.

■ The Board contests this ruling upon the ground that it is entitled to take judicial notice of its own records. It is the general rule that a court ordinarily will not, either upon its own motion or upon suggestion of counsel, take judicial notice of records, judgments and orders in other and different cases or proceedings, even though such cases may be between the same parties and in relation to the same subject matter. 20 American Jurisprudence, 105, § 87. Petitioner relies on United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 690, 90 L.Ed. 821, which holds that the fact that an administrative agency has considered matters outside the record does not invalidate its action unless substantial prejudice is shown. In that case

the Supreme Court stated: "Each applicant intervened in the proceeding on the other's application, and various parties, including the appellees, appeared in opposition in both proceedings. The parties stipulated that much of the evidence presented in the O. N. C. hearing should be introduced by reference into the Consolidated record." The Supreme Court, therefore, held that the hearings were substantially coordinated, although technically not consolidated, and that no prejudice was shown.

We think the Pierce case, supra, does not apply here. The controlling consideration in this appeal is whether the Ford dealers bought parts or vehicles outside Michigan or sold them outside Michigan. In the Johns Bros. cases there was testimony from which it might have been concluded that some one of the 22 dealers made substantial interstate sales. As to the three respondents here there was no such testimony. It therefore was prejudicial to introduce the records.

In any case the petition for rehearing must be denied upon the ground stated in the opinion that the operations covered are entirely local and do not subject the respondents to the jurisdiction of the National Labor Relations Board. The cases newly cited do not change our adherence to the original holding. In Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, goods were purchased by a wholesale dealer upon the order of a customer with the definite intention that these goods should be delivered at once to the customer. The Supreme Court held that goods obtained by a wholesaler to meet the needs of specific customers pursuant to an understanding were within the stream of commerce until delivery was made. We think this holding does not apply in the instant case. Here there is no evidence that the goods were purchased upon the order of the Ford dealers nor that there was any intention of delivering the goods at once to the Ford dealers. The testimony is that the goods came to rest in the Dearborn warehouse and that later they were purchased in Michigan by the Ford dealers. The automobiles purchased by the dealers were assembled by Ford in Michigan.

Nor do the chain-store decisions cover the present controversy. In Montgomery Ward & Company, Inc. v. Antis, 6 Cir., 158 F.2d 948, the question presented was the coverage under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. of employees of a corporation which operated interstate. While the court held that goods purchased by a chain-store system outside the state are not taken out of the stream of commerce by being sent temporarily to a warehouse, it pointed out that whether an employee is within the Act depends upon his own activities and not upon those of the employer and that an employee may not be in interstate commerce or in the production of goods for commerce even though his employer plainly is.

In Mid-Continent Petroleum Corporation v. Keen, 8 Cir., 157 F.2d 310, the court noted that most of the retail service stations involved were either owned or held under lease by the corporation. There was an identity of business ownership there entirely foreign to the case presented here and this is typical of the chain-store operation. Webster defines a chain-store as follows:

"One of a number of retail stores under the same ownership, under a central management, selling uniform merchandise, and following a uniform policy."

Here the Ford dealers own or lease their own places of business and are, as their contract with Ford specifies, totally independent. Their businesses are individually owned, operated and financed. They are not employees or agents of Ford.

There is a total lack of evidence showing a probable interference with interstate commerce arising from any cessation or interruption of the business of these three dealers. The petition for rehearing is denied.