## NATIONAL LABOR RELATIONS BOARD v. HOWELL CHEVROLET CO.

### No. 13140.

United States Court of Appeals
Ninth Circuit.

Feb. 26, 1953.

Writ of Certiorari Granted May 18, 1953.

See 73 S.Ct. 940.

George J. Bott, Gen. Counsel, N.L.R.B., David P. Findling, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, William J. Avrutis, Attys., N.L.R.B., Washington, D. C., for petitioner.

Findlay A. Carter, Frederick A. Portruch and James M. Nicoson, Los Angeles, Cal., for respondent.

Before STEPHENS and POPE, Circuit Judges, and HARRISON, District Judge.

POPE, Circuit Judge.

Respondent is a California corporation which operates an automobile agency and repair and service shop at Glendale, California. It operates under a non-exclusive agreement with General Motors Corporation to sell Chevrolet cars and trucks. It is supplied with new cars and trucks from an assembly plant maintained at Van Nuys, California, where all of the new cars and

trucks purchased by respondent were assembled and the process of manufacture completed. Approximately 43 per cent of the component parts of automobiles and trucks which were shipped to the Van Nuys plant and used in the assembling and manufacturing process there carried on, were obtained from points located outside of California. All of the respondent's sales were made within California.

Upon the threshold we are confronted with the contention that the respondent is not subject to the jurisdiction of the Board. We think that the record requires an affirmance of the Board's findings of jurisdiction. In National Labor Relations Board v. Townsend, 9 Cir., 185 F.2d 378, this court found jurisdiction in respect to the activities of a local Hudson automobile dealer where it appeared that while the respondent, operating at Santa Maria, California, purchased all of his new automobiles from the Hudson Sales Corporation at Los Angeles, yet the latter organization shipped all of such automobiles into the State from outside points. The difference here, of course, is that the Van Nuys assembly plant does not bring into the State completed automobiles but completes the assembly and manufacture there of cars and trucks but 43 per cent of whose component parts are shipped in from outside points.[1]

We think that the difference between this and the Townsend case is one of degree only and not of substance. Another aspect present here, a circumstance not disclosed in the Townsend case, is that respondent operated under a dealer's agreement with General Motors Corporation pursuant to which the latter exercises control over the respondent's capital requirements, places of business, hours, service facilities, personnel, signs and local area advertis-

ing. The findings of the Board recite: "The Respondent is one of a limited number of dealers selling Chevrolet products, and, by virtue of its contractual relationship with Chevrolet Motor Division-General Motors Corporation, is an integral part of that corporation's national system of distribution. Under the foregoing circumstances and on the basis of the entire record, we find, as did the Trial Examiner, that the respondent is engaged in commerce within the meaning of the Act, and that it will effectuate the policies of the Act to assert jurisdiction over the Respondent." The contractual relationship thus referred to is substantially the same as the automobile sales agreement described in National Labor Relations Board v. Ken Rose Motors, 1 Cir., 193 F.2d 769, 771, which the court said "ties the respondent into a vast national network of an integrated distribution system which affects commerce."

However, on January 20, 1953, the Court of Appeals for the Sixth Circuit handed down its decision in National Labor Relations Board v. Bill Daniels, Inc., 202 F.2d 579, which expressly disapproved the Ken Rose Motors decision. Speaking of the Board's contention based on the Ken Rose case, the court said: "In order to be an integral part of Ford these dealers would have to be either employees or agents of Ford. It is not contended that they are employees and there is no evidence in the record that the dealers are agents of Ford. The contracts in essence are contracts between vendor and purchaser. * * * The fact that they cooperate to avail themselves of the privilege of national advertising is so small an element in the operation that it does not affect the conclusion that the work done is local."

1. The Trial Examiner set forth the facts as follows: "The Chevrolet Division— General Motors Corporation—maintains a new car and truck assembly plant at Van Nuys, California, from which the Respondent obtains its new cars and trucks. For the fiscal year ending September 30, 1950, motor vehicle production parts, parts and accessories valued in excess of $5,000,000 were shipped to the said Van Nuys plant, of which amount approximately 43 per cent were shipped from points located outside the State of California. During the aforesaid fiscal year, the Respondent's purchases from Chevrolet Motor Division— General Motors Corporation—amounted to more than $1,500,000 but were less than $2,000,000."

■ We think that this is not an answer to the real question here posed. For in our view the final inquiry must be whether the employer's activities bear such "a close, intimate and substantial relation to trade, traffic and commerce among the states" that "any widespread application of the practices here charged might well result in substantially decreasing the influx of materials"[2] into the state. We think that the impact of automobile sales agreements of the kind here involved upon that question is not dependent upon whether those agreements square with common law concepts of principal and agent, or employer and employee. Rather, it seems to us, the important matter is, how does the arrangement work? Is the tie-up between respondent and General Motors Corporation, accomplished by this agreement, regardless of what it would be called under the traditional nomenclature used by lawyers, nevertheless such that the Board's finding that respondent "is an integral part of that corporation's national system of distribution", has " 'warrant in the record' and a reasonable basis in law". Labor Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170.[3] We think the answer is yes.

Both because this court's decision in the Townsend case, supra, controls us here, and because the Board's finding on the effect of this contractual relationship on the flow of interstate commerce is one which we should not disturb, we hold that the Board's finding that the respondent was engaged in commerce within the meaning of the act must be affirmed by us.

2. The quoted language is from Labor Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 684, 71 S.Ct. 943, 949, 95 L.Ed. 1284.

3. In that case the question was whether certain newspaper vendors were "employees" within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Reversing this court's decision, 136 F.2d 608, 612, that they were independent contractors, since the word "employee" must be "given its conventional meaning as developed under the common law", the Supreme Court held the newsboys were "employees" and said: "It will not do, for deciding this question as one of uniform national application, to, import wholesale the traditional common-law conceptions or some distilled essence of their local variations as exclusively controlling limitations upon the scope of the statute's effectiveness. * * * Congress recognized those economic relationships cannot be fitted neatly into the containers designated 'employee' and 'employer' which an earlier law had shaped for different purposes. * * * In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications. * * * That term [employee], like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship. 'Where all the conditions of the relation require protection, protection ought to be given.' * * * It is not necessary in this case to make a completely definitive limitation around the term 'employee.' That task has been assigned primarily to the agency created by Congress to administer the Act. Determination of 'where all the conditions of the relation require protection' involves inquiries for the Board charged with this duty. * * * Undoubtedly questions of statutory interpretation especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute. * * * But where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. Like the commissioner's determination under the Longshoremen's & Harbor Workers' Act, that a man is not a 'member of a crew' (South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 547, 84 L.Ed. 732) or that he was injured 'in the course of his employment' (Parker v. Motor Boat Sales, 314 U.S. 244, 62 S.Ct. 221, 222, 86 L.Ed. 184) and the Federal Communications Commission's determination that one company is under the 'control' of another (Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147), the Board's determination that specified persons are 'employees' under this Act is to be accepted

In January, 1950, the International Association of Machinists, here called the Union, initiated efforts to secure members from among the respondent's employees. Meetings were held at which Claude Leonard, one of the employees, was selected as shop steward or senior chairman. By January 31, 1950, 15 of the 28 employees in the bargaining unit [4] had signed cards designating the Union as their collective bargaining representative. The Union under that date wrote to the respondent claiming to be the majority representative of the employees, and asked for recognition and for a conference to discuss an agreement. On the same day the Union filed a representation petition with the Board. Respondent received the Union letter on February 1, 1950, but did not answer it because, as it now says, it in good faith doubted the Union's majority claim.

Following the incidents just mentioned, there occurred the acts which the Board has found constituted a violation by the respondent of § 8(a) (1), (3) and (5) of the National Labor Relations Act as amended.[5] With respect to the claimed restraint and coercion and interference with the employees in the exercise of their right of self-organization, guaranteed in § 7,[6] the Board asserts that the respondent's president, its attorney, its service manager and the foreman of its body shop, "all acted to bring home to the employees the futility of their supporting the union and the advantage which would accrue to them if they kept away from it." More specifically, the Board found that respondent's president, Jackson Howell, before the election which the Board ordered on the Union's petition mentioned above, urged an employee to "vote in favor of the plant", and said to him that if the employee would do so, Howell would see that the employees "got a raise in time." The Board also found that Howell had promised to other employees that if the Union were defeated the employees would receive a raise.

The Board also found that one Bordeau, respondent's service manager, likewise promised a raise in pay for the employees if the Union were defeated, and that he had stated in the presence of two employees that if the Union were victorious at the election, respondent would shut down its operations.

Other statements along the same line with which the Board has charged the respondent, and on which it has made findings against it, are those of one Ogen who bore the title of "body shop foreman" in the respondent's organization. The testimony before the Board disclosed that when employee Leonard, who, as above stated, had been selected as an officer of the Union, showed up wearing his Union button, Ogen commented upon the button and made remarks to the effect that president Howell had told Ogen that the former was going to fire anybody who joined the Union; that Ogen did not want to be near Leonard while the latter wore the button because he did not want to get fired. There was also much evidence as to a number of talks which the respondent's attorney Potruch made to the employees, first when they were all assembled in one body, and later to separate

---

if it has 'warrant in the record' and a reasonable basis in law."

4. The unit found appropriate by the Board consisted of all respondent's employees except supervisors and certain non-operating employees.

5. "§ 8. (a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; * * * (5) to refuse to bargain collec-

tively with the representatives of his employees, subject to the provisions of section 9(a) * * *."

6. "§ 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)".

groups. In these talks Potruch undertook to state at considerable length the views of respondent with regard to the Union's organizing activities and the forthcoming election.

In the course of his address to the employees, the attorney stated that it was the view of the respondent that because the Company was one operating solely within the State, the Board had no jurisdiction; that the respondent would contest the jurisdiction of the Board, and that perhaps it would be found that in order to get the issue before a court, the respondent would have to do something which would cause it to be cited for an unfair labor practice. The attorney's speech to the employees contained a lengthy discussion of the rights of the Union and of the employer under the Act; statements that there could not be any changes in wages or working conditions during the period that was required to test the jurisdiction of the Board, and that it was the attorney's personal opinion that if he were an employee he would handle his problems not through a union but by direct dealing with the employer. The Board did not find any violation of the Act in the portions of the speech just mentioned, but it did find that at one of the group meetings which the attorney had with a number of the employees, the attorney stated that "there would be a new deal after the first of the month", that is to say, after the election. The Board construed this to be a promise of benefit violative of § 8(a) (1) of the Act.

With respect to the charge of discrimination in violation of § 8(a) (3), the Board found that the employee Leonard above mentioned, was discharged by the respondent because of his leadership in union activities among the employees. As to the refusal to bargain in violation of § 8(a) (5), the Board found that respondent's failure to respond to the Union's letter of February 1, 1950, was not because of any good faith doubt of the Union's majority, or because it was awaiting the outcome of the representation proceeding before the Board, but that on the contrary, it was pursuant to its determination to deny the jurisdiction of the Board and to litigate that issue; that

the respondent ignored the Union's request for recognition and embarked on the campaign of unfair labor practices previously mentioned, in consequence of which, the election of June 1, 1950, which the Union lost, did not represent the free and uncoerced choice of the employees.

By way of remedy the Board set the election aside, ordered the reinstatement of employee Leonard with back pay, directed the respondent to cease and desist from discouraging membership in the Union, from coercing its employees and refusing to bargain collectively with the Union, and directed the posting of certain notices.

Respondent contends that the evidence is insufficient to support the Board's findings of restraint and coercion. The principal attacks upon these findings relate to the testimony concerning the remarks of attorney Potruch and the conduct of foreman Ogen. Concerning Potruch, it is contended that in substance his talks amounted to no more than expressions of the views of respondent that the Board had no jurisdiction because of the local character of its business. It is said that under § 8(c) such an expression of "any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice". As for the anti-union remarks of Ogen, respondent says that his conduct is not imputable to it; that the only evidence with respect to Ogen's supervisory authority is that he was called a "foreman"; that there was no evidence that Ogen had any of the powers which are listed in that portion of the Act defining the term "supervisor". Title 29 U.S.C.A. § 152(11).

We find it unnecessary to resolve this controversy with respect to the effect of the statements by Potruch and by Ogen. It is apparent that the Board attached but minor significance to the remarks of the attorney; as for Ogen, his acts might well be such as to be chargeable to his employer under the rule of International Ass'n of Machinists, etc., No. 35 v. Labor Board, 311 U.S. 72, 79, 81, 61 S.Ct. 83, 85 L.Ed. 50, and of National Labor Relations Board v. Security W. & Cold S. Co., 9 Cir., 136 F.2d 829, 833. But wholly apart from those considerations, it is clear that the Board's findings with respect to this aspect of the case, are supported by

the evidence relating to statements of the respondent's president and of its service manager, Bordeau.

Respondent argues that the Board should not have followed the trial examiner in believing certain witnesses who testified that the remarks were in fact made by these men. Respondent complains bitterly because "the Board has chosen to believe Smith's version rather than the truthful version of Howell", and refers to Smith as one "whom we have shown to be a drunkard with a strong animus toward respondent; he is unworthy of belief." The Board also credited the testimony of the same witness who testified that he heard Bordeau make the statement that if the shop went union the respondent would shut its doors. Respondent argues that "the Board becomes positively ridiculous in credibility resolution", because the witness himself did not participate in the conversation but merely overheard it, and because the statement was made at a cocktail bar.

■ Of course it is not the function of this court to say that the Board and the trial examiner have believed the wrong witnesses. "So long as the Board's findings are supported by substantial evidence on the record appraised as a whole, they will not be disturbed. When supported by credible evidence, the Board's choice between two conflicting views may not be displaced, 'even though the court would justifiably have made a different choice had the matter been before it de novo.'" National Labor Relations Board v. Nabors, 5 Cir., 196 F.2d 272, 275, and cases there cited. See also National Labor Relations Board v. Dinion Coil Co., 2 Cir., 201 F.2d 484.

■ The same considerations must dispose of respondent's contention that there is no substantial evidence to support a finding that the employee Leonard was discharged on account of his union activities. The testimony on behalf of respondent was that Leonard, who had been assigned to do "brake work" was discharged and the duties formerly performed by him were turned over to another employee Herrick who had been doing "front end and frame straightening work" because the latter was better qualified to do the combined job, and the amount of work was decreasing so that there was not enough to keep both men busy. It is strenuously urged that there is no evidence that the employer was conscious of Leonard's union activities and that in any event other employees including Herrick wore their union buttons and were not discharged.

The Board's finding of an unfair labor practice in this regard was based upon the evidence that Leonard was in fact a very competent mechanic and fully capable of performing not only the brake work which he had been doing but the work that Herrick was doing as well. The button which Leonard wore and to which Foreman Ogen took such violent exception, was not an ordinary union button but a shop steward's button, which indicated his leadership in the union activities. Coincident with the commencement of the organizing activities, the employer began to take work normally assigned to Leonard, who worked on a piece time basis, away from him and to give it to the men on the lubricating rack. The work of the shop, instead of falling off, increased after Leonard's discharge; Herrick's earnings nearly doubled, and he found it necessary to call in an outside worker four times in order to keep his work up. We think that substantial evidence supports the Board's findings as to the reason for Leonard's discharge.

■ Respondent also attacks the Board's findings as to the respondent's refusal to bargain. It says that it was not established that on January 31, 1950, when there were 29 employees in the unit, 15 of them had designated the union as their authorized representative. Proof of membership in the union was established by means of the union authorization cards which the employees signed. One of the cards received in evidence was that purporting to be signed by employee Malstrom. Respondent says that there was no testimony to prove the authenticity of the card because no one testified that Malstrom signed it. The evidence was that early on the morning of January 31, 1950, Leonard handed the card in question to Malstrom and asked him to sign it; that Malstrom said he would sign it and return it. Before 10 A.M. of the same day, Malstrom brought the card to

Leonard. Malstrom's name had been signed to the card when it was thus returned. Obviously, the contention that there was lack of authenticity is without basis for no matter who wrote Malstrom's name on the card, Malstrom clearly adopted it as his own signature.

■■■ We think that the evidence abundantly supports the Board's finding that the respondent did not withhold its recognition of the Union because of a good faith doubt of the Union's majority, and that its conduct generally was motivated by a desire to gain time in which to destroy the Union's majority. The respondent had the right to question the Board's jurisdiction over its operations and to test that right in the courts. It also had the right to tell its employees of its intentions in that regard and that if the Board found against it, it would litigate that issue to the respondent's "last dollar" through all the courts to the Supreme Court. But it is plain that the respondent so made this undertaking its primary purpose and objective and so continuously kept its eye upon this legal issue that it overlooked its duty in good faith to bargain and prepare to bargain with the Union.

■■■ Respondent asserts that because the Union did not withdraw its representation petition and participated in the election, the Union waived the unfair labor practices here discussed and that it was improper for the Board to set aside the election. The processing of a representation petition, however, is a matter in which the decisions to be made relate to policies which Congress has in general committed to the discretion of the Board. We think that the action of the Board was within its discretion and within the scope of its power as set forth in Joy Silk Mills v. National Labor Relations Board, 87 U.S.App.D.C. 360, 185 F.2d 732, 741.

■■■ Finally, respondent argues that it was denied a fair hearing and due process of law because of the partiality and unfairness of the trial examiner. It objects to the action of the trial examiner in frequently asking questions of witnesses and says that on those occasions the answers elicited generally aided the General Counsel. Much of the arguments upon this aspect of the case is based upon the proposition that the trial examiner must have been biased and prejudiced and that he must have predetermined the issues against respondent because he so consistently found against it and resolved questions of credibility in favor of those who testified on the other side. Respondent maintains that the trial examiner was obliged to accept as true statements made by its own witnesses when those statements were not contradicted. It says: "It is well settled law that where a witness' testimony is not contradicted, a trier has no right to refuse to accept it." This is an ancient fallacy which somehow persists despite the courts' numerous rulings to the contrary. It overlooks the significance of the carriage, behavior, bearing, manner and appearance of a witness,—his demeanor,—when his testimony is given orally in the presence of the trier of facts. As stated by the Court of Appeals for the Second Circuit in a recent case, Dyer v. MacDougall, 201 F.2d 265, 269: "Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." That court took cognizance of this in National Labor Relations Board v. Dinion Coil Co., supra, a case in many respects similar to the one now before us.

■■■ We are unable to observe in the conduct of the trial examiner, or in his interposition to ask questions of witnesses, anything to indicate any unfairness or desire to do other than ascertain the facts. That he uniformly credited testimony favorable to the Board and uniformly discredited the testimony of the respondent is not sufficient to warrant a conclusion that he was biased and prejudiced against respondent. Labor Board v. Pittsburg S. S. Co., 337 U.S. 656, 659, 69 S.Ct. 1283, 93 L. Ed. 1602.

Enforcement of the Board's order is granted.

STEPHENS, Circuit Judge (concurring).

Once the business of the automobile dealer is held to be in interstate commerce, there is nothing to do but order the Board's order enforced. And this we must do under National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, and National Labor Relations Board v. Townsend, 9 Cir., 1950, 185 F.2d 378.

Notwithstanding, I remain unconvinced that the word "employee" actually means more in the Wagner Act than elsewhere (Hearst case) or that a simple business transaction within a state is interstate commerce because of a fine-spun tracing of a remotely possible and unmeasurable relation to trade across a state line (Townsend case). Judge Harrison joins me in this concurrence.