### NATIONAL LABOR RELATIONS BOARD v. NORMA MINING CORP. et al.

No. 6582.

United States Court of Appeals
Fourth Circuit.

Argued June 24, 1953.

Decided July 13, 1953.

---

4. In some cases it would seem that business improvement has followed the abandonment of the mill village.

Owsley Vose, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Rose Mary Filipowicz, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Harold R. Schmidt, Pittsburgh, Pa. (Thomas G. Shufflebarger, Richlands, Va., Jacob M. Murdock, John L. Laubach, Jr., and Rose, Rose & Houston, Pittsburgh, Pa., on the brief), for respondents.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us upon a petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of its order against the respondents herein.

The Board's order requires the respondents Norma Mining Corporation (hereinafter called Norma), Alfredton Coal Company (a partnership hereinafter called Alfredton), and Ward Brothers' Coal Company (a partnership, hereinafter called Ward), to cease and desist from discouraging membership in any labor organization by discriminatory practices and from interfering with, restraining, or coercing their employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act (hereinafter called the Act), 29 U.S.C.A. § 151 et seq. Affirmatively, the order requires Norma and Alfredton, jointly and severally, to make Roy Artrip whole for any loss of pay suffered as a result of the discrimination against him; requires Norma and Ward, jointly and severally, to make whole the twelve employees laid off by the closing of the Ward mine, for any loss of pay suffered by them because of the discrimination; requires Norma to offer to lease to Claude E. Mabe the mining property which he formerly operated on the same terms and conditions as prevailed when the lease covering this property was discriminatorily cancelled on June 30, 1951, and to make whole the employees terminated as a result of the cancellation; and directs that the three respondents post appropriate notices.

We first consider the Board's finding that Norma and its lessees, Alfredton, Ward and Mabe, were joint employers of the employees involved in this proceeding and that Norma was responsible under the Act for the activities hereinafter set out, affecting the employees of Alfredton, Ward and Mabe. The Trial Examiner, who saw and heard the witnesses, ruled that Norma and its lessees, Alfredton, Ward and Mabe, were bona fide independent contractors and not co-employers.

A careful study of the record convinces us that the Trial Examiner here was clearly right and that the finding of the Board was not sustained by substantial evidence in the record considered as a whole. We must, accordingly, absolve Norma from responsibility under the Act

for those activities affecting the employees of its lessees, and we must decline to enforce those portions of the Board's order imposing sanctions upon Norma.

The Board's finding that Norma was a co-employer of the employees in the leased mines seems to have been based on two factors: (1) the so-called economic relationships between Norma and its lessees, which the Board believed made the parties a single integrated coal business; and (2) the control Norma had a right to exercise, and allegedly did exercise, over the miners in the leased mines by virtue of certain provisions in the licensing agreements. These agreements were in fact and law leases, not makeshift instruments masquerading under a false name.

Norma was a completely separate corporation with eight stockholders, each of whom was a director. Alfredton was a partnership. Ward Brothers was a partnership, and Industrial Constructors was either an individual proprietorship operated by Broom, or a partnership consisting of Broom, Mabe and Jeter, from which Jeter withdrew. In addition to the three mentioned lessees, Norma also had contractual relationships with at least six or seven other entities operating on the same basis. Except for the fact that Mrs. L. McGlothlin (one of the partners in Alfredton) was the wife of Norma's secretary, and G. W. McCall (a Norma stockholder with an one-sixth interest) had some brothers and a son operating M. and W. Coal Company (another of Norma's independent contractors), there was no family connection between Norma and any of the independent contractors.

Norma's principal business was not the mining of coal but the processing and sale of coal delivered to it, primarily by its lessees, with about 17% from producers other than its lessees. The Board stressed certain provisions in these leases which were favorable to Norma. Thus, the price to be paid to the lessees for coal delivered to Norma was dependent upon the price Norma received for the coal. Norma could, upon twenty-four hours' notice, suspend the operations of the lessees if Norma could not sell the coal at a reasonable profit.

Norma could terminate the lease upon "violation or breach * * * of any of the convenants." Upon the termination of the lease, all permanent installations (such as tipples, chutes, docks and outbuildings) constructed by the lessee would become the property of Norma. Norma had a limited right to prescribe what seams of coal should be mined by the lessee, and its officials could (and did) inspect the mines to see that its instructions in this respect were carried out.

Now for the other side of the picture. Each lessee assembled its own working force and managed it completely by determining the mode, method and manner of working for each of its employees in the day-to-day mining operations. Each lessee completely controlled the hiring and firing of its employees, together with the rate and method of pay, which varied from time to time and from mine to mine.

Norma had no financial interest in any of its independent contractors, made no loans to any of them, made no payments to any of them other than the contract price for coal purchased, did not advance credit, did not withhold or deduct taxes or assessments of any kind, did not own any of lessees' equipment, and maintained a general separation from their affairs.

There was no joint occupancy of premises or joint use of equipment by Norma and any of the lessees; nor did the employees of Norma work alongside the employees of the lessees. Each leased mine had its own entry.

Such connection as Norma had with the activities of the lessees was entirely consistent with the independent contractor relationship. Only in isolated and non-recurring instances did Norma supply equipment to the lessees, or assist the lessees in securing equipment.

No useful purpose would be served by a discussion and analysis of the cases on this point cited in the briefs. Respondents rely heavily on Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947; United States v. Silk, 331 U.S. 704, 67 S. Ct. 1463, 91 L.Ed. 1757; National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed.

1170; National Labor Relations Board v. Bill Daniels, Inc., 6 Cir., 202 F.2d 579; National Labor Relations Board v. Steinberg, 5 Cir., 182 F.2d 850; National Labor Relations Board v. Phoenix Mutual Life Insurance Co., 7 Cir., 167 F.2d 983, 6 A.L. R.2d 408; Magruder v. Yellow Cab Co., of D. C., 4 Cir., 141 F.2d 324, 152 A.L.R. 516. Among the cases stressed by the Board are: Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638; Rutherford Food Corporation v. McComb, 331 U. S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; National Labor Relations Board v. Southland Mfg. Co., 4 Cir., 201 F.2d 244; National Labor Relations Board v. Gluck Brewing Co., 8 Cir., 144 F.2d 847; National Labor Relations Board v. Condenser Corporation of America, 3 Cir., 128 F.2d 67; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815.

This brings us to the Board's finding that Roy Artrip was discriminatorily discharged by Alfredton, in violation of Sections 8(a)(1) and (3) of the Act, because of his union activities. For the reasons stated above, we must absolve Norma from any responsibility here, and the Board's order in this connection will not be enforced as to Norma.

We think there is ample evidence to sustain the Board's finding as to Alfredton, and the Board's order requiring Artrip's reinstatement by Alfredton and his being made economically whole by Alfredton will be enforced.

Artrip, an early proponent of unionization along the unorganized Seaboard seam, was discharged soon after Alfredton became aware of his union activity. Alfredton's opposition to unionization was evidenced by Superintendent Hooker's openly expressed conviction that it could not operate "under the union's scale." When Artrip was hired, Hooker apparently had no knowledge of his union sympathies. When Hooker heard that Artrip had been engaged in organizational activities, Hooker abruptly discharged Artrip without any warning in the middle of a track laying project in which he was engaged. The only explanation then given to Artrip was that he had been working with union field representatives "trying to organize." No fault was found with Artrip's work, and when he was discharged Hooker assured him that it was satisfactory.

Before the Board, Alfredton took the position that Artrip was discharged because the "particular job" for which he was employed was completed on January 22, "on which date he was advised that because he had completed his specific work, and there was nothing further for him to do, he was no longer needed." The record, however, clearly rebuts this contention. Hooker himself testified that at the time Artrip was hired as a "track man" his employment was not limited to any particular period. Artrip was given no notice before his discharge of the possibility of the work running out. On the contrary, he was kept busy laying track all day January 22, and had sent out for more track which had to be laid, before he was suddenly pulled off the job. And when he was discharged, Artrip was not notified that the work for which he was hired was completed.

There is evidence not only that track work was continued after Artrip's discharge, but also that it increased substantially soon thereafter. Hooker admitted that after Artrip's discharge, track work continued to be done, and that less than three weeks later, there was even more track work, and a new man, Dewey Brown, was then hired.

We next come to the Board's finding that Norma and Ward violated Sections 8(a)(1) and (3) of the Act by threatening to shut down the Ward mine if the Union came in, and by discriminatorily shutting down the mine and laying off the twelve miners there employed, with the resulting order that Norma and Ward jointly and severally make whole these twelve employees for any loss of pay thereby suffered.

For the reasons heretofore set out, Norma, since it was not a coemployer of these twelve employees, must be relieved from this provision of the order.

There is, however, substantial evidence to sustain both this finding of the Board and its order as to Ward.

The Union's success in organizing the miners along the Seaboard seam, and the election of one Williamson to the presidency of the newly organized local on Sunday, January 28, evoked immediate repercussions from his employers. There is evidence that the next morning Preston Ward announced that Ward could not "pay the price," and threatened that before he would "fool" with the Union he would take his machine "to Bear Wallow and run a sawmill with it;" and that McCall (a director of Norma) said that they would "have to get rid" of Williamson or "give up our lease"; and later repeated the same ultimatum to Williamson himself. That evening, without apparent reason, all the men were laid off and the Ward mine shut down. The next day Paul Ward told Williamson that he should not have "went down there (to the Union meeting) Sunday and caused all this trouble," and that Ward would work somewhere else "to keep from having anything to do with the Union."

Ward insisted that the mine was closed because of the bad condition of the road leading from the Ward Mine to the tipple of Norma. The road was in no worse shape on the day of the shutdown than it had been just previously. Ward trucked coal over the road on the day of the shutdown and the day following. No mention was made of the road when the shutdown was announced. When employee White asked Paul Ward why he said their job was "tore up," Ward did not answer. The only explanation given was Paul Ward's statement that he would rather sell his equipment than have "any more headaches" with the men. Nor did Ward inform the employees how long the mine was expected to be shut down, or when they could expect to return, which was contrary to Ward's past practice.

Whether the shutdown was caused by the condition of the road or by a determination to break the Union is a question of fact. The Board's finding that an intent to break the Union was the real motive for the shutdown finds ample support in the record. See, National Labor Relations Board v. Southland Mfg. Co., supra; National Labor Relations Board v. English Mica Co., 4 Cir., 195 F.2d 986; Hartsell Mills Co. v. National Labor Relations Board, 4 Cir., 111 F.2d 291.

■ There is ample evidence in the record that justifies the Board's order requiring that Alfredton and Ward cease and desist from discouraging membership in any labor organization by discriminatory practices and from interfering with, restraining or coercing their employees in the exercise of rights guaranteed by Section 7 of the Act, and directing that appropriate notices be posted. Again, Norma, since it was not a coemployer of the employees of Alfredton and Ward, must be relieved from these provisions in the Board's order.

■ Finally, we cannot enforce that part of the Board's order requiring Norma to offer a lease to Claude Mabe of the mining property he formerly operated and to make whole Mabe's employees whose employment was terminated by Norma's cancellation of the Mabe lease. We need not go into the motives that prompted Norma to cancel this lease, even if these motives, as the Board found, were sinister. We have held that Norma and Mabe were independent contractors, lessor and lessee, respectively, and that Norma was not a coemployer of Mabe's employees. Thus, the cancellation of a lease by one who is merely a lessor falls without the ambit of the Act.

For the reasons set out above, the Board's order must be modified so as to relieve Norma from all its provisions. The order, as we have indicated, will be enforced as to Alfredton and Ward.

Order modified and enforced.