**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MISSOURI TRANSIT COMPANY, and its President, P. W. Fletcher, Respondents.**

**No. 15796.**

United States Court of Appeals Eighth Circuit.

Dec. 27, 1957.

Frederick U. Reel, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Duane B. Beeson, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Glenn L. Moller, St. Louis, Mo. (Moller & Talent, St. Louis, Mo., on the brief), for respondents.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

The National Labor Relations Board has petitioned this Court, under Section 10(e) of the National Labor Relations Act as amended (61 Stat. 136, 29 U.S. C.A. § 151 et seq.), for the enforcement of an order issued by the Board against the respondents on August 14, 1956, fol-

lowing the usual proceedings under Section 10 of the Act. (116 N.L.R.B. 587.) The respondents ask that the petition be denied.

The Missouri Transit Company, a Missouri corporation, was at all times here material a common carrier of passengers by bus for hire, operating under authority of the Interstate Commerce Commission and of the public service commissions of the States of Iowa and Missouri. The Company was engaged in two operations. One was a short-line intrastate shuttle-bus-line operation between Waynesville, Missouri, and Fort Leonard Wood, Missouri, and the other was a long-line interstate bus operation between the latter place and Cedar Rapids, Iowa. P. W. Fletcher was the President and in control of the Company.

Early in August 1954, Lee R. Blackwell, President and Business Agent of Local 864 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L.-C.I.O., undertook to organize the employees of the Transit Company for the purpose of having that Union become their representative for purposes of collective bargaining. Shortly thereafter, John Wagner, an "over-the-road" or long-line bus driver, and Dillard W. Wilkes, a shuttle-line bus driver, were discharged by Fletcher, ostensibly for cause. The campaign of the Union to organize the shuttle-bus-line drivers resulted in a representation hearing before the Board on October 1, 1954.

On October 22, 1954, Fletcher, on behalf of the Transit Company, made an agreement with a competitor in the shuttle-bus-line operation, whereby the competitor bought all the equipment used in the operation of the shuttle route, and undertook to operate it. This resulted in the discontinuance, on October 29, 1954, by the Company of the shuttle-line route and service, and terminated the employment of its shuttle-line drivers.

Upon charges of unfair labor practices, filed by the Union with the Board in December 1954, the General Counsel of the Board issued a complaint in December 1955, charging, in effect, that to discourage the unionization of their employees the respondents had, in violation of Section 8(a) (1) and (3) of the Act, threatened, interrogated, and promised benefits to, the employees; had discharged two employees because of their presumed leadership in the union movement; and had discontinued the shuttle-line operation and ended the employment of those engaged in that operation.

A hearing was held and testimony taken before a Trial Examiner of the Board at Waynesville on January 31 and February 1, 1956. In his Intermediate Report the Trial Examiner sustained the charges made by the General Counsel of the Board in his complaint. The respondents on April 4, 1956, served exceptions to the Intermediate Report, and also moved the Board to set it aside and grant a new hearing because of the alleged bias and prejudice of the Trial Examiner and the asserted misconduct of the representative of the General Counsel at the hearing. In the alternative, the respondents asked the Board to reopen the hearing to permit them to introduce additional evidence.

The Board overruled the respondents' motion. The Board found that Wagner and Wilkes had been discharged because of union activities, in violation of Section 8(a) (3) and (1) of the Act. The Board also found that the respondents disposed of the shuttle-bus route and the equipment used in operating it, and discharged the shuttle-bus drivers, for discriminatory reasons, in violation of Section 8(a) (3) and (1) of the Act.

■ Needless to say, the respondents contended throughout the proceedings before the Board, and still contend, that Wagner and Wilkes were discharged not because of union activities but because of an unprovoked assault upon another employee, and that the shuttle-bus operation had been disposed of solely because it was unprofitable, and that the effort of the Union to organize the employees had nothing to do with it. These issues were, under the evidence, issues of fact for the Trial Examiner and the Board to de-

termine, and not questions of law for this Court. See Kitty Clover, Inc. v. National Labor Relations Board, 8 Cir., 208 F.2d 212, 214.

 The contentions of the respondents that they were denied a fair hearing before an unbiased trial examiner, we think are without merit and are adequately answered by the Board in its decision. There is no adequate basis in the record for a ruling that the Trial Examiner was intentionally or prejudicially unfair in his conduct of the hearing or in his rulings of which the respondents complain. Cf. Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 113; Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 215, 219. Rather obviously, in view of the factual situation out of which the controversy arose, a remand of the proceeding for a retrial of the issues would be not only unwarranted, but futile.

 The only important question in this case, we think, is wheher that part of the remedy prescribed by the Board which requires the reimbursement of the shuttle-line bus drivers for loss of earnings after October 29, 1954, when the shuttle-line operation was terminated by the sale of equipment and complete abandonment of the operation, is subject to enforcement.[1]

With respect to this question, counsel for the Board say in their brief:

"* * * Affirmatively, the Board's order requires respondents to offer reinstatement to substantially equivalent jobs on any of the Company's lines to all employees found to have been discriminatorily discharged, provided that they are qualified for such jobs. The Board's order further provides that, if there are not a sufficient number of jobs available for such employees and the Company's other employees, all jobs are to be distributed among both groups in accordance with whatever nondiscriminatory employment practices have ordinarily been applied by respondents, and that any remaining employees for whom jobs are not available be placed on a preferential hiring list. Finally, the Board's order requires respondents to make whole each employee against whom it has unlawfully discriminated for

---

1. The Board, in prescribing "The Remedy," said:
 "* * * The Respondents contend that they are precluded by existing contracts covering their long-line drivers from hiring any of the discriminatees on their long-line operations without violating the seniority provisions of such contracts. To avoid any such conflict, we shall require that, if there is not sufficient work available for all the qualified discriminatees and Respondents' other employees, all available positions be distributed among both categories without discrimination against any employee because of union membership or activity, in accordance with the system of seniority or other nondiscriminatory practice heretofore applied by the Respondents in the conduct of their business.5 The Respondents shall place such of the foregoing employees, if any, for whom no employment is available after such discrimination, on a preferential list, with priority in accordance with such system of seniority or other nondiscriminatory practice heretofore applied by the Re-

spondents in the conduct of their business, and thereafter offer them reinstatement as such employment becomes available and before other persons are hired for such work.
 "We shall also order the Respondents to make whole each employee against whom it has discriminated for any losses that he may have suffered because of the Respondents' discrimination, by payment to him of a sum of money equal to the amount that he normally would have earned as wages from the date of such discrimination to the date of a proper offer of reinstatement, or placement on a preferential list, as the case may be, less his net earnings during said period, the back pay to be computed on a quarterly basis in the manner established by the Board in F. W. Woolworth Company, 90 NLRB 289.
 "5. If, as the Respondent apparently contends, it has separate seniority for its long-line drivers, the effect of our order will be to require that the discriminatees be placed at the bottom of the long-line seniority list."

any loss of earnings, and to post appropriate notices."

The respondents, in answer to the Board's petition for enforcement, say:

"2. The remedy prescribed by the petitioner requires that respondents place the persons named in the petitioner's Order on a preferential hiring list for priority consideration for jobs on the long line operations, a completely separate division of the respondents' operations, and requires that respondents pay back to these individuals from the date that the respondents went out of the shuttle bus business to the date when respondents reinstate the shuttle bus drivers or place them on a preferential hiring list in the long line division of the respondents' operations.

"3. Respondents state that to require respondents to pay back beyond the date of the permanent termination of the shuttle bus operations and to place said drivers on a preferential hiring list of a completely different, separate and independent operation of respondent is arbitrary, capricious, punitive and contrary to law."

It is the contention of the respondents that, regardless of motive, their sale of the shuttle-bus-line equipment and definite termination of that part of their business, resulting in the elimination of the jobs of those employed in it, ended any right they could have to back pay beyond October 29, 1954, the date the respondents ceased to operate the shuttle-bus-line. Respondents rely upon the decision of this Court in National Labor Relations Board v. New Madrid Mfg. Co., 8 Cir., 215 F.2d 908, in which we denied enforcement of an order of the Board against an employer—found by the Board to have been guilty of discriminatory discharges of the employees at one of its branch plants—for back pay beyond the time it sold the plant and ceased operating it. In that case, after pointing out that one who succeeds to a business in which unremedied unfair labor practices have occurred may, by implication, under certain circumstances, have the sins of his predecessor visited on him, we said (at page 914 of 215 F.2d):

"But none of this can be taken to mean that an employer does not have the absolute right, at all times, to permanently close and go out of business, or to actually dispose of his business to another, for whatever reason he may choose, whether union animosity or anything else, and without his being thereby left subject to a remedial liability under the Labor Management Relations Act for such unfair labor practices as he may have committed in the enterprise, except up to the time that such actual and permanent closing or true and bona fide change in ownership has occurred. No one can be required to stay in private business, and no one can be prevented from permanently closing or abdicatingly selling such a business. And the Act affords no basis on which to order a person to reinstate employees in a business which he has, with plain finality, put out of existence, or which he has actually disposed of to another, and as to which he neither in law nor in fact possesses any power over the operations of his successor, either of management right in general or of labor-relations control in particular. Cf. Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718, 726. No more, in our opinion, can the Act be said to contain any basis to assess remedial back-pay against such a person, beyond the date of his permanent closing or abdicating sale of the enterprise."

Had the Board in the instant case ordered the respondents to reinstate the shuttle-bus-line drivers in the intrastate operation which had been sold and over which respondents no longer had any control, we would consider our decision in the New Madrid case controlling; but here—unlike in the New Madrid case—

the Board did not find that, after the sale of the shuttle-bus line, the respondents were in control of that operation. The Board did not order the respondents to reinstate the shuttle-bus-line drivers to their jobs in that portion of the respondents' business. The Board required respondents to employ the drivers, without discrimination, in the retained interstate operation as jobs became available for which they were qualified and could be employed, and to make them whole for loss of wages resulting from the unfair labor practices which the Board found the respondents had committed. The Board made no such order as to the employer's other plant and operations in the New Madrid case. We cannot say that the order of the Board here is not a proper remedial order. If there is to be any modification of the order, the Board will have to make it.

Enforcement of the order under review is granted.