325 F.2d 682
 DARLINGTON MANUFACTURING COMPANY and Deering Milliken, Inc.,
Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Textile Workers Union of America, AFL-CIO, Intervenor.
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Darlington Manufacturing Company and Deering Milliken, Inc.,
Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DEERING MILLIKEN AND COMPANY, Inc., Respondent.
 Nos. 8790, 8861, 8906.
 United States Court of Appeals Fourth Circuit.
 Argued June 13, 1963.
Decided Nov. 15, 1963.
 
 Thornton H. Brooks, Greensboro, N.C. (McLendon, Brim, Holderness & Brooks, Greensboro, N.C., on the brief) for Darlington Manufacturing Co.
 Stuart N. Updike and John R. Schoemer, Jr., New York City (Townley, Up-dike, Carter & Rodgers, New York City, On the brief) for Deering Milliken, Inc., and Deering, Milliken and Company, Inc.
 Nancy M. Sherman, Atty., N.L.R.B., Arnold Ordman, Gen. Counel; (Dominick L. Manoli, Associate Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel, and James C. Paras, Atty., N.L.R.B., on the brief) for National Labor Relations Board.
 Benjamin Wyle, New York City (Patricia Eames, New York City, on the brief) for Textile Workers Union of America, AFL-CIO.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and BELL, Circuit Judges, sitting en banc.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 The National Labor Relations Board in these consolidated cases has made these pivotal decisions:[1]
 
 
 2
 1. Darlington Manufacturing Company committed an unfair labor practice under the National Labor Relations Act, Section 8(a)(3)[2] -- forbidding discrimination in regard to tenure of employment-- by closing and liquidating its only plant, and discharging its employees, in 1956 because of the election of Textile Workers Union of America, AFL-CIO as bargaining representative for the employees;
 
 
 3
 2. Darlington must pay all of such discharged employees their wages, less current net earnings, 'until the discharged employees are able to obtain substantially equivalent employment' or until they are put on a preferential hiring list by Deering Milliken, Inc.; and
 
 
 4
 3. Deering Milliken, Inc. and its affiliates are liable for the payment of these wages on the ground that Darlington, with others, was such an affiliate of Milliken and together they constituted a single employer.
 
 
 5
 In petition No. 8790 Darlington and Milliken seek to vacate these Board orders. In No. 8861 the Union, which was the charging party before the Board, prays that the orders be enlarged to require also the reopening of the Darlington plant with reinstatement of the employees, and that Roger Milliken, president of both Darlington and Milliken, notwithstanding the contrary decision of the Board, be held personally liable to satisfy the orders. In No. 8906 the Board seeks enforcement against Milliken of the Darlington liabilities.
 
 
 6
 As these actions have common issues they have been argued and considered together. We decline to enforce these orders of the Board against Darlington and Milliken.
 
 
 7
 Darlington, chartered under the laws of South Carolina, operated a print cloth mill there, manufacturing and selling cotton greige goods. It had no other plant. In 1937 Darlington went through a Section 77B bankruptcy proceeding, 11 U.S.C. 207 (1937 ed.). Milliken, then known as Deering Milliken & Co., Inc., as one of the largest creditors, received in payment of its debt about 41% Of Darlington's common stock. When Darlington was liquidated in 1956, as previously mentioned, there were outstanding 150,000 shares of common stock owned as follows:
 
 
 8
 Deering Milliken & Co., Inc. 41.4%
Cotwool Manufacturing Corp. 18.3
Roger Milliken and members of
 his immediate family 6.4
Directors and employees of
 Deering Milliken & Co. 2.9
Outsiders or non-Milliken family
 or interests (about 100 stockholders
 living in South Carolina,
 50 in New York, and more
 than 50 scattered over the United
 States) 31.0
 ------
 100.0%
 
 
 9
 In March 1956 the Union commenced a campaign to organize the Darlington employees and to become their bargaining representative. An election conducted under the direction of the Board was called for September 6, 1956. The Union won, 258 to 252.
 
 
 10
 On September 12 Darlington filed objection to the election. A conference was requested on the same day by the Union to discuss a collective bargaining agreement. The request was refused by Darlington on the ground the election protest had not been decided and the Union had not been certified.
 
 
 11
 Also on September 12, the Board of Directors met, with all of them present. Following a brief discussion of the business status of Darlington, they resolved to recommend to the stockholders the liquidation and dissolution of the corporation. A meeting of the stockholders to act upon the resolution was called for October 17. Employees of Darlington were at once told of the recommendation. While no new ones were accepted, the plant continued to fill the orders then in hand. The objection of Darlington to the election was overruled on October 8, and the Union shortly certified as the bargaining representative.
 
 
 12
 With the stockholders on October 17 adopting the recommendation of the Board of Directors by a vote of 134,911 shares to 3,774 the officers proceeded with the liquidation. Discharge of employees occurred over a span of about six weeks: from 510 employees on October 13, the payroll dropped to 460 on October 20, to 345 on October 27 and to none when the plant closed on November 24. The machinery and equipment were sold at auction on December 12 and 13, 1956. Since that time Darlington has not operated any plant in South Carolina or elsewhere.[3]
 
 
 13
 Deering Milliken & Co., Inc.'s capital stock was owned in a majority amount by the members of the Milliken family. In addition they were the major (but by no means the only) shareholders in Darlington and in certain other textile corporations. The latter are the corporations referred to by the Board and in this opinion-- somewhat imprecisely-- as 'affiliated corporations' of Milliken. Prior to 1960 Deering Milliken & Co., Inc. was not a manufactory. It was the exclusive sales representative of the producing corporations controlled by the Milliken family.
 
 
 14
 In June 1960 Deering Milliken & Co., Inc. was merged into the Cotwool Manufacturing Corporation, and the latter's name then changed to Deering Milliken, Inc., herein known as Milliken. A majority of its stock was owned by the Milliken family. After the merger Milliken carried on the textile manufacturing formerly pursued by Cotwool.
 
 
 15
 The finding of the Board-- that the decision to close the mill was an unfair labor practice under 8(a)(3)-- was spelled out in this way:
 
 
 16
 'Darlington discriminated in regard to its employees' tenure of employment by closing its plant-- thereby discharged the employees-- and, because the plant closing was the direct result of the employees' selection of the Charging Union as their collective bargaining representative, Darlington's retaliation against the employees for their activities in behalf of the Union discouraged the employees' continued membership in the Union.'
 
 
 17
 Abridged and as pertinent here the terms of 8(a)(3) are these:
 
 
 18
 'It shall be an unfair labor practice for an employer-- by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.'
 
 
 19
 In this determination the Board acknowledged, as the Trial Examiner had found, that there were economic considerations sufficient in themselves to support the decision by Darlington to terminate operations. However, both the Examiner and the Board concluded that 'the decision to close the mill was not a fact based on economic factors, and that, but for the Union's election victory, that decision would not then have been made.'
 
 
 20
 Upon this premise the Board declared all the closure discharges to be unlawful, justifying the usual remedy of reinstatement and reimbursement for loss of pay. But with the shutdown complete and permanent reinstatement not achievable, the relief was necessarily directed primarily to restitution of wages. The monetary redress was awarded by the Board as follows:
 
 
 21
 'We shall therefore order the Respondent, Darlington, to provide back pay until the discharged employees are able to obtain substantially equivalent employment'.
 
 
 22
 Further, the Board overruling the Trial Examiner found that 'Darlington occupied a single employer status with Deering Milliken and its affiliated corporations'. On this basis Milliken and its affiliates were declared 'liable for back pay to the same extent as we have heretofore directed with respect to Darlington' and were ordered to place the discharged employees ona preferred hiring list. Additionally, Milliken was commanded to offer employment to these discharged workers in its other mills in South Carolina or nearby States, without prejudice to their seniority and other privileges.
 
 
 23
 All of these orders were qualified by the proviso that if no work was available at the Milliken mills, then the accumulation of back pay would be tolled as and when the dischargees were put upon Milliken's preferential hiring list.
 
 
 24
 I. Our opinion is that the decision to close the plant was not an unfair labor practice. In this we accept the findings of fact made by the Board. While, as just observed, the evidence discloses substantial economic reasons warranting the determination to close the plant without reference to the entry of the Union into the plant, we accede arguendo to the contention of the Board that these reasons were not acted upon. Even if they were, however, we shall assume, again arguendo, with the Board that if unionization also played a part in the resolve to close the plant, then the contribution of this factor may be considered as responsible for the cessation.
 
 
 25
 To go out of business in toto or to discontinue it in part permanently at any time, we think was Darlington's absolute prerogative. The fundamental purpose of the National Labor Relations Act is to preserve and protect the rights of both industry and labor so long as they are in the relationship of employer and employee. But the statute's scope does not exceed that province. It does not compel a person to become or remain an employee. It does not compel one to become or remain an employer. Either may withdraw from that status with immunity, so long as the obligations of any employment contract have been met. Such withdrawal, alone and of itself, does not create any obligation of either the employer or the employee to the other under the Act. Cf. Dissenting opinion of Board Member Rodgers in the present case. If a cessation of business is adopted to avoid labor relations, the proprietor pays the price of it: permanent dissolution of his business, in whole or in part. A statute authorizing an order forcing the continued pursuit of operations in these circumstances would be of doubtful validity. Consider the consequences of an attempt to punish as contempt a violation of such an order, and its fatal infirmity is revealed: the proprietor would be jailed or otherwise penalized for not reopening a demised business reinstating employees.
 
 
 26
 Of course, the right of discontinuance which we here uphold, means an actual, unfeigned and permanent end of operations-- not a removal, nor subcontract, nor a change merely in the form of the corporate entity. No ruse or subterfuge is suggested here. Darlington's was an absolute desistence, not a temporary intermission as apparently was contemplated in N.L.R.B. v. Norma Mining Corp., 206 F.2d 38 (4 Cir. 1953). There was no provisional lockout, the mill was not transplanted elsewhere, and its sale was concededly entire, bona fide and irrevocable. The Trial Examiner demonstrated beyond debate that Darlington was not a 'runaway' plant-- that is, a plant having another existence in another form-- finding that Darlington was not hidden among the other Milliken corporations. No disagreement with this finding was, or on substantial evidence could have been, expressed by the Board.
 
 
 27
 'There is no decided case', the Board candidly states, 'directly dispositive of Darlington's claim that it had an absolute right to close its mill, irrespective of motive'. While a number of the decisions on the point mention the presence of a legitimate economic reason in connection with the right to close, an analysis of them discloses that they do not declare the existence of such a reason to be indispensable to the validity of the closing. See, e.g., N.L.R.B. v. Preston Feed Corp., 309 F.2d 346, 352 (4 Cir. 1962); N.L.R.B. v. New England Web, Inc., 309 F.2d 696, 700 (1 Cir. 1962); N.L.R.B. v. Rapid Bindery, Inc., 293 F.2d 170, 175 (2 Cir. 1961); Union Drawn Steel Co. v. N.L.R.B., 109 F.2d 587, 592 (3 Cir. 1940). Nor are they precedents for the proposition that an owner or operator cannot go out of business at his option if the closure is intended to be, and is in truth, absolute and permanent. These authorities, we think, support the view that if the termination is without intent to resume the business elsewhere-- as a runaway-- the power to close, even if spurred by unionization, is not precluded by the Act.
 
 
 28
 The right is implicitly recognized in Southport Petroleum Co. v. N.L.R.B., 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942), with Justice Jackson saying, 'Whether there was a bona fide discontinuance and a true change of ownership--which would terminate the duty of reinstatement' was a question of fact determinable by the Board or the Court on contempt proceedings. Bona fides does not mean exclusively an economic ground, but as well that the termination was, as here, not merely a gesture but an actuality.
 
 
 29
 Lower courts have long given explicit sanction to the right of discontinuance. Over 20 years ago the Fifth Circuit said in N.L.R.B. v. Tupelo Garment Co., 122 F.2d 603, 606 (5 Cir. 1941):
 
 
 30
 'The stockholders of Tupelo Garment Co. (the employer) had the absolute right to dissolve their corporation and the Board was without authority to prevent this.'
 
 
 31
 Recently, the Sixth Circuit put it this way in N.L.R.B. v. R. C. Mahon Co., 269 F.2d 44, 47 (6 Cir. 1959):
 
 
 32
 'We find nothing in the National Labor Relations Act which forbids a company, in line with its plans for operation, to eliminate some division of its work. As held in National Labor Relations Board v. Adkins Transfer Company, Inc., supra, (6 Cir., 226 F.2d 324) an employer faced with the practical choice, either of paying enhanced wage rates demanded by a union or of discontinuing a department of its business, is entitled to discontinue.'
 
 
 33
 Other courts have spoken in like manner and as emphatically, e.g., N.L.R.B. v. New England Web, Inc., supra, 309 F.2d 696, 700; Jays Foods, Inc. v. N.L.R.B., 292 F.2d 317, 320 (7 Cir. 1961); N.L.R.B. v. New Madrid Mfg. Co., 215 F.2d 908, 914 (8 Cir. 1954); N.L.R.B. v. Caroline Mills, Inc., 167 F.2d 212, 214 (5 Cir. 1948); Atlas Underwear Co. v. N.L.R.B., 116 F.2d 1020, 1023 (6 Cir. 1941).
 
 
 34
 To be sure, there are decisions adjudging the employer liable even upon an absolute disposition of all or a part of the business equipment: N.L.R.B. v. Kelly & Picerne, Inc., 298 F.2d 895 (1 Cir. 1962); N.L.R.B. v. Missouri Transit Co., 250 F.2d 261 (8 Cir. 1957); N.L.R.B. v. Bank of America, 130 F.2d 624 (9 Cir.), cert. denied, 318 U.S. 791, 63 S.Ct. 992, 87 L.Ed. 1157 (1942). Upon examination, however, it will be observed that these cases did not involve the extinguishment altogether of the business and the end of further participation by the employer in his former sphere. The predominant element of the principle we maintain is that the business is no longer extant and the owner has forfeited the penalty for withdrawing, that is, he has foregone the privilege of further pursuit of his business.
 
 
 35
 II. The doctrine of single employer, heretofore noted, was used by the Board to project Darlington's liability as determined by the Board, upon Milliken. See N.L.R.B. v. Gibraltar Industries, Inc., 307 F.2d 428, 431 (4 Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963); N.L.R.B. v. Deena Artware, Inc., 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960). Our decision that Darlington is without liability, of course, bars such expansion of responsibility. Furthermore, even if Darlington was a division of Milliken, the transfer of Darlington's liability to Milliken upon the single employer principle is precluded because, as we have stated, a part, like the whole, of a business may be abolished when th extinction is consummated in circumstances like the present.
 
 
 36
 III. In its petition the Union asked us to enlarge the Board's order to include Roger Milliken individually in the orders of restoration of wages entered by the Board. This prayer like the further prayer of the Union that Darlington be required to reopen its plant is, obviously denied by our acquittal of Darlington of liability.
 
 
 37
 The Board sustained the Trial Examiner in finding that Darlington had violated 8(a)(1) in pre- and post-election statements and urging a repudiation of the Union. Likewise 8(a)(5)-- wherein refusal to bargain is made an unfair practice-- was found contravened by Darlington. Remedies for these offenses are not now available as Darlington is no longer alive.
 
 
 38
 Power to command an employer to stay in business indefinitely, or assess him with damages for permanently going out of business, is not a National Labor Relations Board prerogative. Assumed by the Board in these cases, it is denied here.
 
 
 39
 Enforcement of Orders Denied.
 
 
 40
 J. SPENCER BELL, Circuit Judge, with whom SOBELOFF, Chief Judge, concurs, dissenting:
 
 
 41
 If I read the majority opinion correctly it stands for the proposition that an employer may cease business in whole or in part for any reason, including anti-union bias, so long as such cessation is actual, unfeigned and permanent. It also holds that having ceased business and thereby terminated the employer-employee relationship, an employer may not be held liable under the National Labor Relations Act for any violations committed prior to his cessation of business. Since, in the opinion of the majority, an employer may cease business in part for any reason, including anti-union bias, they do not reach the question presented by the Board's finding that Deering Milliken[1] constituted a single employer of which Darlington was a part.
 
 
 42
 In my opinion the question presented to this court is whether an employer commits an unfair labor practice when he closes down a part of his business in order to discourage the practice and procedure of collective bargaining and to retaliate against his employees for exercising their freedom of self organization under the National Labor Relations Act. Not only does such conduct violate the basic policies embodied in the Act; it is literally within the proscription of Section 8(a)(3). Furthermore, it has been held to be an unfair labor practice by prior decisions of this and other Circuits, and I am unable to read the cases cited by the majority in support of its opinion as holding to the contrary.
 
 Single Employer Status
 
 43
 The Board found that there was a sufficient degree of common ownership and control of labor relations and operations among Darlington, Deering Milliken, and its affiliated corporations to hold that these entities were in reality a single employer under the National Labor Relations Act.
 
 
 44
 As this court held in N.L.R.B. v. Gibraltar Industries, Inc., 307 F.2d 428, 431 (4 Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963), a Board determination that two or more economic entities constitute a single employer is entitled to judicial approval if 'there is substantial evidence in the record to support the Board's conclusion and order'. The court in review, moreover, may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo'. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). I am convinced, upon review of the record as a whole, that there was an abundance of evidence to support the Board's position that Darlington, Deering Milliken and its affiliates constituted a single employer for purposes of the Act.
 
 
 45
 The record reveals that Darlington at the time when it ceased operations was one of seventeen corporations in the Deering Milliken complex owning and operating twenty-seven manufacturing plants scattered throughout he Eastern Seaboard. Deering Milliken performed the dual function of selling goods produced by each of these manufacturing corporations and factoring their accounts receivable.[2]
 
 
 46
 The head of Deering Milliken's Tax Department, C. W. Kable, Jr., was an officer of each of the seventeen manufacturing corporations. His Department prepared all federal and state tax returns of the manufacturing corporations and advised them on a wide variety of tax benefits to be derived through following the Department's suggestions in such matters as accounting procedures, vacation plans, and incentive compensation contracts for supervisors. The Tax Department also advised the various manufacturing corporations in the proper drafting of minutes of directors' and stockholders' meetings.
 
 
 47
 The Deering Milliken Insurance Department handled all insurance for the various plants. The manufacturing corporations purchased standard forms of insurance through the Insurance Department, with policies running to each of them. Fire insurance and workmen's compensation insurance, however, were purchased under a policy covering all the plants. Significantly, Deering Milliken paid premiums on an executive air insurance policy covering both Deering Milliken executives and key manufacturing personnel, along with executives of Deering Milliken Service Corporation and Deering Milliken Research Corporation.
 
 
 48
 The Deering Milliken Service Corporation, a wholly owned subsidiary of the seventeen manufacturing corporations, was organized in 1951 for the stated purpose of providing 'essential services to organizations in the textile industry at the lowest possible cost'. These services were restricted, almost exclusively, to those corporations in the Deering Milliken chain. Various departments of Deering Milliken Service purchased all machinery, equipment, and cotton for the manufacturing plants. Research was conducted in the area of product improvement and studies were regularly made in connection with production problems common to several or all of the plants. Based on its findings, Deering Milliken Service made recommendations to the various manufacturing corporations with a view toward obtaining maximum efficiency from raw materials, equipment, and personnel. These recommendations directly affected the work loads and work speeds in the manufacturing plants, a critical area of labor relations.
 
 
 49
 The Placement Department of Deering Milliken Service conducted an annual recruitment program among college students, seeking to attract supervisory personnel for each of the manufacturing corporations. The prospective management and technical trainees were encouraged to look upon the organization as a whole. The record reveals that after hiring there was considerable movement of supervisory personnel between corporations. For instance, approximately half of the supervisors who worked at Darlington between 1951 and 1956 were hired from other Deering Milliken corporations, as was Darlington's Mill Treasurer, James M. Oeland.
 
 
 50
 Supplementing the services carried on by Deering Milliken Service, Deering Milliken Research Corporation conducted surveys and inspections in the manufacturing plants toward the goal of standardizing a preventative maintenance system common to all of the mills.
 
 
 51
 The record, in sum, reveals that the Deering Milliken complex was a thoroughly integrated, monolithic enterprise. The participating mills were able to call upon various service arms of the enterprise to effect optimum employment of men, material, and machinery. Sales were made and factored through a common agency. Management personnel was jointly recruited and transfers freely made from one corporation to another. Moreover, descriptive literature and advertising published by Deering Milliken on behalf of the manufacturing corporations repeatedly emphasized the generic brand name of Milliken rather than individual corporate brand names.
 
 
 52
 After the alleged unfair labor practices which formed the subject matter of the present controversy, Deering Milliken & Co., Inc., in 1960 merged into the Cotwool Manufacturing Corp. to form Deering Milliken, Inc., and several of Cotwool's former subsidiaries were then liquidated into Deering Milliken, Inc. I find the merger of more than passing interest. To me it indicates that the separate corporate entities of the Deering Milliken complex were largely paper corporations which could be shifted and changed at the convenience of the Milliken family. This is highlighted by the fact that the various liquidations and mergers had no substantial effect on the actual functioning of the various entities within the Deering Milliken enterprise. Minot Milliken, Vice President of Deering Milliken, Inc., himself testified that nothing 'of substance' was changed as a result of the merger. I think the ease with which this corporate change was made in 1960 strongly indicates that the Deering Milliken complex in 1956 at the time of Darlington's dissolutin was a single employer in which 'corporate forms (were) largely paper arrangements that (did) not reflect the business realities.' N.L.R.B. v. Deena Artware, Inc., 361 U.S. 398, 403, 80 S.Ct. 441, 444, 4 L.Ed.2d 400 (1960). The critical question becomes, therefore, did the Board have substantial evidence upon which to base its conclusion that there was a degree of common control and ownership existing in this unified industrial complex to warrant finding a single employer?
 
 
 53
 As pointed out in the majority opinion, Deering Milliken's capital stock was owned in majority amount by the members of the Milliken family. In addition they owned controlling stock in Darlington and in all of the other manufacturing corporations. These mill corporations, in turn, owned all the shares of Deering Milliken Service Corporation, and, along with Deering Milliken & Co., Inc., all the shares in Deering Milliken Research Corporation. The stock ownership was used by the Milliken family to place members of the Milliken family in the position of corporate officers and board directors of the various corporations. Roger Milliken was President of Deering Milliken and President also of all the manufacturing corporations except Laurens (where he was Vice President and on the Board of Directors). A majority of the directors of all the manufacturing corporations except one (Hartsville) were members of the Milliken family. Deering Milliken doesn't seriously deny that the Milliken family's stock ownership permitted the family, and more specifically Roger Milliken, to exercise dominion and control over all phases of business and labor relations at each mill and over each and every corporate entity in te entire complex, but rather, it strongly denies that such control was actually exercised.
 
 
 54
 The Board found that through majority stock ownership and interlocking directories, the Milliken family (especially in the person of Roger Milliken) was able to and did exercise actual control in the area of labor relations. As stated by the Board:
 
 
 55
 'Roger Milliken, the president of all of the corporations save one, exercised ultimate control over the labor relations of all of the corporations. Thus he received reports from each of the mills as to progress in reducing the number of jobs, the pay raises given, hours worked and job assignments, was asked for approval of various personnel actions, and made suggestions as to the hiring of personnel. More important, however, was Roger Milliken's participation in the area having the greatest impact on labor relations-- the area of collective bargaining. Thus he circulated a memorandum and editorial which was obviously intended as a primer for the managers of the mills in combatting union organization. During the organizational compaign his pervasive influence was demonstrated by the statements of supervisory employees that Roger Milliken would close the plant rather than permit its unionization.'
 
 
 56
 The Board does not suggest that Roger Milliken actually engaged in the day to day direction of labor relations at each of the plants. The day to day details inevitably had to be left to the resident chief executive officers, the Mill Treasurers. Everything other than over-all direction and guidance as to company policy of labor relations would, of necessity, have to be exercised by subordinates. Indeed it seems remarkable that Roger Milliken had the time, in view of his far flung interests and responsibilities, to keep informed about labor relations in the individual mills and to make the detailed suggestions as to many facets of labor relations that the record reveals he did. The record is replete with suggestions and recommendations by Roger Milliken to the Mill Treasurers on ways to improve production and reduce jobs. For instance, Roger Milliken on different occasions proposed that each piece of machinery be tagged with its cost to discourage misuse, that closed circuit television be utilized to eliminate certain jobs, that machinery be rearranged to reduce the operator's walking distance, that the time which employees spent smoking be limited, and that beverage dispensing machines for employee use be installed. These suggestions were usually made in reference to 'our' mills. These and other suggestions were not always followed, but they unmistakably indicate that Roger Milliken kept himself constantly informed as to what was occurring and didn't hesitate to suggest improvements.
 
 
 57
 Proof of Roger Milliken's ultimate and uncontradicted control over major policies affecting labor relations was illustrated by his decision, with approval of his family, to close the Darlington plant because of the employees' decision to be represented by a union.
 
 
 58
 After the union had won the Board supervised election of September 6, 1956, Darlington Mill Treasurer Oeland and Darlington attorney Poag telephoned Roger Milliken to advise him of the union's victory. One day later, Roger Milliken decided to close down the mill. Roger Milliken informed three members of his family, who were on the Darlington Board of Directors, of his intention to close the mill, he did not inform Mill Treasurer Oeland. On September 12, the Board met and unanimously passed a resolution to close the mill. This resolution was acted upon at a shareholders' meeting of October 17 and passed by a large majority, with only a few shareholders who were residents of the Town of Darlington voting against liquidation. Immediately after the shareholders' meeting, Roger Milliken was informed by South Carolina State Senator Mozingo, a resident of the Town of Darlington, that 83% Of the mill employees disavowed the union and had signed a petition to go back to work. Roger Milliken's reply was: 'As long as there are 17% Of the hard core crowd here I refuse to run the mill.'
 
 
 59
 Thus I find in the record overwhelming evidence to support the Board's holding:
 
 
 60
 'We conclude that Deering Milliken, primarily through the person of Roger Milliken, exercised control over the labor relations of all the corporations, including Darlington. Although the details of day-to-day personnel relations ma have been, of necessity, conducted at the mills, it is manifest that the major decisions were exclusively in the hands of Roger Milliken. Under such circumstances it is clear that Deering-Milliken must assume responsibility for control of Darlington's labor relations.'
 
 
 61
 Deering Milliken's brief ocntends that the Board had no basis to find that Roger Milliken was not acting solely in his capacity as President of Darlington Mills. The evidence, however, points to the fact that Roger Milliken retained ultimate control over the whole Milliken complex and acted as its chief executive officer, without delineating his various capacities. The Darlington Mill was but a small unit in a vast industrial empire employing more than 19,000 persons owned and controlled directly or indirectly by the Milliken family. Its closure was intended to be and was a grim deterrent to the thousands of employees in the affiliated plants who might entertain similar notions of unionization. Such conduct was properly considered by the Board to fasten responsibility of his actions for unfair labor practices upon the entire complex.
 
 Closing Mill Unfair Labor Practice
 
 62
 Having found that the Board had ample evidence to conclude tha the Milliken complex was a single employer under the Act, the next question to consider is whether under the decided cases, the act of Deering Milliken in shutting down the Darlington plant was an unfair labor practice, cognizable under Section 8(a)(3).
 
 
 63
 That the plant closure was the direct result of the organizational activities of the employees is too well documented by the record to require extended discussion. Roger Milliken himself gave that reason to his stockholders for his decision to close the mill. On approximately thirty separate occasions, supervisory personnel threatened the employees with closure in case the union won, and attributed their prophesies to Roger Milliken's well publicized hostility to unions. Milliken himself circulated to all of his mills a trade magazine article pointing out that his attitude was so well known that liquidation was inevitable from the minute the election result was announced. Darlington's belated efforts to stress the economic factors are belied by the prior history of the mill. In the nine months prior to the election, management had spent $400,000.00 in a modernization program which included not only new machinery but additions to plant structure. A belief that union wage demands and bargaining attitudes towards work loads may make future operations unprofitable does not constitute an economic reason which would excuse the petitioner's conduct inthis case. The Board found upon abundant evidence that the respondent's conduct was discriminatorily motivated.
 
 
 64
 'Conduct which on its face appears to serve legitimate business ends in these cases is wholly impeached by the showing of an intent to encroach upon protected rights. The employer's claim of legitimacy is thereby totally dispelled (Citing cases). '* * * 'The ultimate problem is the balancing of conflicting legitimate interests. Teh function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' Labor Board v. Truck Drivers Union, 353 U.S. 87, 96 (77 S.Ct. 643, 647, 1 L.Ed.2d 676).' National Labor Relations Board v. Erie Resistor Corporation, et al., 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308.
 
 
 65
 This court has held, in unison with other Circuits, that an employer may neither temporarily shut down operations to avoid bargaining with a union, N.L.R.B. v. Norma Mining Corp., 206 F.2d 38 (4 Cir. 1953), nor may he subcontract out work to another employer formerly done by a division in his business for that purpose, N.L.R.B. v. Preston Feed Corp., 309 F.2d 346 (4 Cir. 1962). Moreover, other Courts of Appeals have held that an employer may not transfer work to another plant owned, directly or indirectly by the employer himself, to avoid bargaining. See, e.g., N.L.R.B. v. United States Air Conditioning Corp., 302 F.2d 280 (1 Cir. 1962); N.L.R.B. v. Winchester Electronics, Inc., 295 F.2d 288 (2 Cir. 1961); N.L.R.B. v. Lexington Electric Products Co., 283 F.2d 54 (3 Cir. 1960); cert. denied, 365 U.S. 845, 81 S.Ct. 805, 5 L.Ed.2d 810 (1961); Butler Bros. v. N.L.R.B., 134 F.2d 981 (7 Cir. 1943). I fail to see any distinction in principle between such conduct and that of the Petioner here.
 
 
 66
 More to the point, I consider the decision of this court in N.L.R.B. v.Preston Feed Corporation, 309 F.2d 346 (4 Cir. 1962) as controlling on the legal issue here. In that case the Board sought enforcement of its order requiring the employer to reinstate its trucking operations which the Board found had been closed down in order to discourage unionization among its employees. This court enforced the order, pointing out that although the employer had decided for valid economic reasons to close the operation in the future, its sudden and precipitate closure was to discourage unionization and, therefore, constituted an unfair labor practice which could be remedied by requiring reopening until the employer could vindicate its closing for economic reasons. Judge Soper, speaking for a unanimous court, recognized the employer's right to close for valid economic reasons:
 
 
 67
 'The question has been considered in a number of cases in which the Board, in order to effectuate the purposes of the Act, has though it desirable to require an employer to continue a certain business operation or department which he desired to abandon. In these cases it has been uniformly held that the Board is without power to interfere with management where the discontinuance of a part of the business is prompted by legitimate business motives and not in order to frustrate the purposes of the Act or interfere with employees in the exercise of rights conferred upon them by the statute. (Citing cases). 'In the instant case, as we have seen, the initial decision of the company to close its trucking department was based on economic reasons and not on hostility to the union, but the immediate decision and the prompt closing of the department on March 6th, when it was discovered that the employees led by the union were insisting upon their rights under the statute, was impelled by the intent to restrain the employees in their rights to collective bargaining. We shall, accordingly, enter a decree that the order of the Board in these and other particulars be enforced * * *.' 309 F.2d at 352.
 
 
 68
 It is apparent that the Board's order in this case is within the rationale of this court's judgment in the Preston case. See also N.L.R.B. v. Norma Mining Corp., 206 F.2d 38 (4 Cir. 1953), where this court through Judge Dobie, speaking for a unanimous court, enforced the order of the Board requiring an operating lessee to reopen a mine closed by the employer in violation of Section 8(a)(1) and (3) of the Act.
 
 
 69
 Again, the Eighth Circuit in N.L.R.B. v. Missouri Transit Co., 250 F.2d 261 (8 Cir. 1957) faced a situation closely analogous to the one we have here. The Board's finding of an unfair labor practice and the relief granted by teh Board and enforced by the court support the Board in this case. The Missouri Transit Company was a common carrier of passengers by bus for hire engaged in two operations: one a short-line intrastate shuttle bus operation between Waynesville, Missouri, and Fort Leonard Wood, Missouri; the other a long-line interstate bus operation between Fort Leonard Wood and Cedar Rapids, Iowa. As a result of union attempts to organize the shuttle-line bus drivers, the company sold all the equipment used in the operation of the shuttle route to a competitor. This action resulted in the discontinuance by the company of the shuttle-line route and service, and terminated the employment of all shuttle-line bus drivers. Upon the filling of an unfair labor practice against the company, the Board found that the company had disposed of the shuttle-line route and equipment used in operating it, and had discharged the shuttle-line drivers, for discriminatory reasons, in violation of Section 8(a)(3) and (1) of the Act. In granting affirmative relief, the Board ordered that the company place the discharged drivers on a preferential hiring list for priority consideration for jobs in the long-line operations and that the company pay back wages to these individuals from the date that the shuttle-line bus operations were closed to the date when they were either reinstated or placed on a preferential hiring list.
 
 
 70
 The company contended that the Board was powerless either to order back pay beyond the time when the shuttle-line bus operation ceased or to order reinstatement in a completely separate and independent division of the company. The Eighth Circuit rejected the Company's contentions and ordered enforcement of the Board's order in full. I think the logic of the Missouri Transit case compelling and the application of the principles announced clearly appropriate to the case here being considered.
 
 
 71
 In N.L.R.B. v. Wallick, 198 F.2d 477 (3 Cir. 1952), that court sustained a Board order requiring a respondent partnership which operated several enterprises engaged in the manufacture of ladies' garments to either reopen a plant which it had closed in violation of the Act because its employees had organized or give its employees an opportunity to work in other plants operated by the partnership. This was true even though the closed plant was owned by a separate corporation the stock of which was owned by the individual partners. See also A. M. Andrews Co. of Oregon v. N.L.R.B., 236 F.2d 44 (9 Cir. 1956).
 
 
 72
 In the present case, even absent single-stockholder status, the employees had a remedy. After the Darlington stockholders on October 17, 1956, had adopted the recommendations of the Board of Directors to liquidate the Darlington Mill, employees were discharged in separate groups over the intervening period until the plant closed on November 24. Yet, pursuant to the laws of South Carolina, the corporation continued to exist for the purpose of liquidating its assets and settling its liabilities. If, as the Board found, amply supported by teh record as a whole, these discharges were for discriminatory reasons under Section 8(a)(3), relating to the employees' 'tenure of employment,' then at a very minimum the amounts realized from the sale of Darlington machinery and equipment should be allocated to reimbursing the discharged employees for lost wages from the time of their discharge until the liquidation of the corporation had been completed. It is obvious that if one or two, or even a majority of employees had been discharged for their activities on behalf of the union, then the court would uphold a Board finding of an 8(a)(3) violation. It seems tortuous logic to say, therefore, that because the company discharged without distinction both the employees who voted against the union (but who were discharged nonetheless because a majority of the employees elected to be represented by a union) and those who voted for the union, the company is absolved from liability under the Act.
 
 
 73
 But beyond this remedy I think the Board was justified in ordering Deering Milliken to provide back pay until the discharged employees were able to obtain substantially equivalent employment. The record reveals that a large number of Darlington supervisory personnel was absorbed into the Deering Milliken complex. Late in September 1956, the Deering Milliken Industrial Engineering Department sought and obtained from Darlington Mill Treasurer Oeland a list of Darlington supervisory personnel who might be 'useful' to it. All of these men were interviewed by the Department. Plans were made to have all supervisory personnel of the Darlington Mill transferred to the Department's payroll for a three month period after their separation from Darlington. The purpose of this arrangement was to provide a period of time within which these men could be 'picked up' by other Deering Milliken Mills. Some of these supervisors were actually picked up, going directly on the payroll of other mills without an interval on the payroll of the Department. Others were transferred to other parts of the Deering Milliken organization. Although some supervisors ceased their affiliation with Deering Milliken entirely, they were given time off, with pay, in which to seek new employment opportunities. One of these men was Mill Treasurer Oeland, who remained on the Darlington payroll until July, 1957, some seven months after mill machinery and equipment had been sold. In addition, a few supervisors received bonus payments after the Darlington closing in appreciation of their efforts during the union crisis. Thus, even though the Deering Milliken complex disclaims any responsibility after the Darlington closing for those whom it regards as its enemies, it managed to reward and find places for those whom it regarded as its friends. I see nothing to prevent enforcing the Board's order which would also require Deering Milliken to offer substantially equivalent employment to non-supervisory personnel who were equally adversely affected by the mill's closing.
 
 
 74
 I am not unmindful of the Board's findings that Darlington committed other violations in addition to the 8(a)(3) here discussed, specifically 8(a)(1) and 8(a)(5). The repeated threats of members of management that the mill would be shut down if the union won the representation election constituted a classic form of interference, restraint, and coercion proscribed by Section 8(a)(1). Section 8(a)(1) was also violated by management threats to blacklist union adherents, their interrogation of employees regarding their union activity, and their support of a petition disavowing the union after the announced intention of Roger Milliken to close the mill upon learning of the union victory.
 
 
 75
 The Board also found that the failure of the Company to bargain with the union with respect to the tenure of employment of the employees in the Darlington Mill and to furnish the union with wage and related bargaining data constituted an unfair labor practice under Section 8(a)(5) and (1). I am convinced that the record as a whole amply supports the Board's findings, but do not feel that an extended discussion of these violations is warranted here.
 
 
 
 [1]
 139 NLRB No. 23, decided October 18, 1962
 
 
 [2]
 29 U.S.C. 158(a)(3)
 
 
 [3]
 A concise history of the proceedings in this case appears in Judge Haynsworth's opinion for this Court in Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (1961)
 
 
 [1]
 Throughout this opinion Deering Milliken is used to refer to the entire complex of 27 manufacturing corporations and the affiliated service corporations unless it is clear from the context that the reference is to the factoring and sales agency, Deering Milliken and Company, Inc., later merged into Cotwool Manufacturing Corp. and then called Deering Milliken, Inc
 
 
 [2]
 Each mill corporation was charged a fee for services rendered. The service charges made were substantially less than those which would have been made by independent selling and factoring agents. Also of importance is the fact that Deering Milliken had no other non-Milliken affiliated mills as clients